**In re ANCHOR RESOLUTION CORP., (formerly, Anchor Glass Container Corporation) and Anchor Recycling Corporation, Debtors.**

**Bankruptcy Nos. 96–1434, 96–1516(PJW).**

United States Bankruptcy Court,
D. Delaware.

Feb. 4, 1998.

Laura Davis Jones, Joel Waite, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Laurence Greenwald, Mark Wintner, Kenneth Pasquale, Stroock & Stroock & Lavan L.L.P., New York City, for the Debtor and Debtor-in-Possession.

Louis J. Yoppolo, Brown, Schlageter, Craig & Shindler, Toledo, OH, for American Flint Glass Workers Union.

Douglas S. Stanger, Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziono, Northfield, NJ, for Glass, Molders, Pottery, Plastics, and Allied Workers International Union.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

Before the Court are the cross-motions for summary judgment filed by Anchor Resolution Corp. (f/k/a Anchor Glass Container Corp.) (the "Debtor"), the Glass, Molders, Pottery, Plastics & Allied Workers International Union ("GMP"), and the American Flint Glass Workers Union, AFL—CIO ("AFGWU") with respect to Debtor's objections to claims filed by GMP and AFGWU (collectively, the "Unions"). GMP's and AF-GWU's respective claims arise out of·certain collective bargaining agreements (each, a "CBA"; collectively, the "CBAs"), which Debtor assumed and assigned pursuant to an asset sale transaction.

The Court shall grant a motion for summary judgment filed pursuant to Federal Rule of Bankruptcy Procedure 7056 where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue of material fact. (See Debtor's Mem. at 12; GMP's Br. at 6; AFGWU's Mem. at 3.)

The CBAs contain provisions that require payments to union employees; those payment obligations arose following the Court-approved assumption and assignment. Debtor asserts that Code § 365(k)[1] precludes the assertion of a claim against Debtor for post-assignment obligations under the CBAs. The Unions counter that by allowing the assignment they did not waive any executory-contractual rights as against Debtor; that Code § 1113, not Code § 365(k), governs the assumption and assignment of the CBAs; and that, since Debtor did not comply with the provisions of Code § 1113, certain liabilities under the CBAs remain with Debtor.

For the reasons stated below, I will grant Debtor's motion, and deny the respective motions of GMP and AFGWU.

## JURISDICTION

The Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(b) as a matter arising under Code § 365. Furthermore, this proceeding is a core proceeding that concerns the "allowance or disallowance of claims against the estate." See 28 U.S.C. § 157(b)(2)(B). The case is before the Court pursuant to the Omnibus Order of the United States District Court for the District of Delaware, dated July 23, 1984, referring bankruptcy matters to this Court for hearing and determination.

## FACTS

In March 1996, Debtor and GMP negotiated two CBAs to cover the three-year period of April 1, 1996, through March 31, 1999.[2] Under the CBAs, GMP agreed to accept the following wage terms: no increase in the basic hourly wage rate for the first year of the contract; an increase in the second year of the contract that would leave GMP members at a rate below the industry standard as reflected in contracts between GMP and Owens–Brockway Glass Container Co. ("Owens") and between GMP and Ball–Foster Glass Container·Co., L.L.C. ("Ball–Foster");

---

1. 11 U.S.C. § 101 et seq. are herein referred to as "Code § _____."

2. GMP represents two groups of hourly employees: Production and Maintenance Department ("P & M") and Automatic Machine Department ("AMD"). There were two separate CBAs: one for P & M (approximately 2,960 members) and one for AMD (approximately 1,240 members).

and a further increase in the third year of the contract that would align the basic hourly wage rate of Debtor's GMP workers with the rate of GMP workers elsewhere.

In exchange, Debtor obligated itself to make three supplemental payments during the course of the three-year term. First, "[e]mployees working in plants that are sold, merged and/or transferred to another company shall be paid retroactively any general increases forfeited in the 1st and/or 2nd year of the contract and their rates of pay will reflect full 1st, 2nd and 3rd year general increases." (AMD CBA at 95; P & M CBA at 77–78.) Second, Debtor agreed to pay AMD members, but not P & M members, on the payroll as of April 1, 1996, a one-time payment of $700 by separate check on the earlier of April 1, 1997, or the date of retirement or termination. Third, Debtor agreed to a single payment of $300 in stock of Debtor's parent Vitro, S.A., (the "GMP $300 Bonus") to both P & M and AMD members who were on the payroll as of April 1, 1996, on the earlier of April 1, 1997, or the date of retirement or termination. GMP asserts a claim in the aggregate amount of $6,284,896 arising out of these three payment obligations.

Effective September 1, 1996, Debtor entered into two three-year labor contracts with AFGWU, one covering members at the Zanesville, Ohio, plant and one covering members at all other plants operated by Debtor. These CBAs limited AFGWU members to below-industry-rate wages for the first two years of the contract. In exchange, Debtor agreed to pay a $300 sign-on bonus on September 1, 1997, (the "AFGWU $300 Bonus") to members on the payroll as of September 1, 1996, and AFGWU members employed as of September 1, 1997, the beginning of the second year of the contract, would be entitled to receive a single bonus of $450, $550, or $650, depending on job category (the "$450–$650 Bonus"). AFGWU asserts a $323,000 claim arising out of these two payment obligations.

Debtor filed its voluntary petition under Chapter 11 of the Code on September 13, 1996.

On or about October 4, 1996, Debtor filed a motion for an order approving a certain asset purchase agreement, involving the sale of substantially all of Debtor's assets to Ball–Foster, and for authority to assume and assign certain executory contracts in connection with the sale. After a hearing, in an order dated October 15, 1996, this Court, among other things, denied the motion, scheduled a hearing on the sale of Debtor's assets, and approved bidding procedures related to the sale.

On or about November 1, 1996, Debtor served a notice of assumption and assignment of certain executory contracts and unexpired leases. This notice announced the hearing date of November 22, 1996, for the purposes of approving an asset purchase agreement and granting the assumption and assignment of executory contracts:

> Pursuant to the Scheduling Order, you are hereby advised of the Debtor's current intention to assume and assign to Purchaser the Executory Contract(s) listed on the information sheet affixed hereto ... and the pre-petition amount owing on each of such Executory Contracts to be cured....

(Nov. 1 Notice at 1.) The CBAs were listed on the information sheet. The Unions received this notice and did not object to the cure amounts—zero—or the assumptions and assignments.

On December 2, 1996, Owens and Consumers Packaging Inc. ("Consumers") submitted a joint bid to purchase Debtor's assets. Following a hearing on notice, this Court issued an order on December 20, 1996, (the "Sale Order") approving the bid as documented in an asset purchase agreement dated December 18, 1996 (the "APA"). The Unions received notice of the proposed sale and did not object to the sale transaction. The Sale Order recited that a "reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all interested parties and entities, including ... all parties to Executory Contracts to be assumed and assigned to Consumers or Owens, as applicable, who have received Assumption Notices from the Debtor...." (Sale Order ¶ 7, at 6.) Moreover, the Sale Order went on to state that

[e]ach non-Debtor party to an Executory Contract which was served with an Assumption Notice is hereby barred and enjoined from asserting against the Debtor, or the Debtor's estate ... any objection to the assumption and assignment of such non-Debtor party's Executory Contract or the Cure Amount, as the latter may have been amended, of which the non-Debtor party was given notice prior to the Hearing. The assignment of each Executory Contract to the applicable Purchaser will not cause a default or otherwise allow the non-Debtor party thereto to terminate or adversely affect such Purchaser's rights thereunder. In no event shall Purchasers be liable for any Cure Amounts or pre-Closing Date liabilities arising from or related to the Executory Contracts with the exception of any Assumed Liabilities.

(*Id.* ¶ 21, at 23–24.) Prior to the closing on the transaction, Consumers assigned its rights and obligations under the APA to Anchor Glass Acquisition Corp., Consumers' wholly owned subsidiary that was formed for this purpose, which subsequently changed its name to Anchor Glass Container Corp. ("New Anchor").

On January 31, 1997, this Court entered an order pursuant to Code § 365 approving the assumption and assignment of the executory contracts (the "Jan. 31 Order"). The Jan. 31 Order included the finding that other than the cure amounts, there were no other amounts due under the contracts other than certain post-petition, pre-closing-date amounts payable in the ordinary course of business. (*See* Jan. 31 Order ¶ 3, at 5.) The Jan. 31 Order further stated that assumption and assignment would relieve Debtor from any further liability with respect to any post-assignment breach of the subject executory contracts, including the CBAs:

Each Executory Contract on the Second List of Contracts shall, upon assignment to the applicable Purchaser, be deemed to be valid and binding on the Purchaser to whom such Executory Contract is assigned and in full force and effect and enforceable in accordance with its terms, and following such assignment, except for the payment of the Cure Amount, the Debtor shall be relieved pursuant to section 365(k) of the Bankruptcy Code, of any further liability with respect to any breach of such Executory Contract after such assignment.

(*Id.* ¶ 4, at 5–6.)

On or about February 5, 1997, Debtor closed on the sale of substantially all of its assets to Owens and New Anchor pursuant to the terms of the APA. Owens and New Anchor assumed all rights and obligations arising from and after the closing date under the CBAs pursuant to APA § 9.05, which provides in part:

Effective as of the Closing, [Owens] shall and Consumers shall cause New Anchor to, subject to Section 10.01(h), (i) assume all of the currently existing collective bargaining agreements with respect to the Purchased Assets to be acquired by each such Buyer and (ii) employ all of the Business Union Employees under said collective bargaining agreements.

(APA § 9.05, at 56.)

Section 10.01(h) of the APA, as to which the above-stated assumption obligation is subject, is found in Article 10 of the APA, which sets forth numerous conditions to the buyers' obligation to close on the contract. The § 10.01(h) condition reads as follows:

(h)(i) The provisions of the master and local collective bargaining agreements covering employees of Seller and its subsidiaries relating to work rules shall have been amended to reflect prevailing industry standards and (ii) any retroactive (but not prospective) payments of wage increases forfeited in prior periods under such agreements as a result of the consummation of the transactions contemplated hereby shall have been waived or the Bankruptcy Court shall have issued an order, not subject to stay, that Seller may assign and the applicable Buyer may assume such collective bargaining agreements without any acceleration of the deferred wage increases negotiated under the current agreements.

(APA § 10.01(h), at 59.)

Before the closing date, GMP, Debtor, and New Anchor engaged in discussions directed at accomplishing some type of waiver of the

retroactive wage adjustment. Debtor was not successful in reaching an agreement with GMP on this matter. However, GMP and New Anchor entered into an agreement (the "Agreement"), which addressed the retroactive wage adjustment and a number of other matters covered by the CBAs. In contemplation of the closing and the assumption of the CBAs, the Agreement recited that it was "contingent upon [New Anchor] successfully completing the purchase of [Debtor's] assets." (Agreement at 1.) In recognition of the assignments to be effective at closing, the Agreement recited that New Anchor will be adopting GMP's CBAs, including "the assumption of liabilities arising under the pension plan for hourly employees, and the recognition of past service of hourly employees covered by the [CBAs]." (*Id.*) However, the Agreement modified the CBAs by eliminating the retroactive wage increase provision: "The language in the [CBAs] regarding the retroactivity in the event of a sale of a plant shall not be paid by [New Anchor] as a result of this Agreement." (*Id.* at 2.) The GMP $300 Bonus was also eliminated: "The language in the [CBAs] regarding $300 in Vitro stock to be tendered on April 1, 1997 shall not be paid by [New Anchor] as a result of the Agreement." (*Id.*)

With respect to AFGWU's CBAs, Debtor, Owens, New Anchor, and AFGWU had discussions and circulated draft agreements before the closing date regarding waivers of the two bonus obligations. (*See* AFGWU's Resp. at 4–5.) AFGWU agreed, as between itself and Consumers and Owens respectively, that it would waive the AFGWU $300 Bonus, contingent on the closing. (*See id.* at 5.) Nothing indicates that AFGWU waived the $450–$650 Bonus. (*See id.* at 6.) No agreement was made between Debtor and AFGWU. (*See id.* at 5–6.)

By a letter dated February 5, 1997, GMP's counsel advised Debtor's counsel that GMP had not waived the right to file a claim against the Debtor for the retroactive wage increases and the GMP $300 bonus, and announced that a claim would be filed accordingly. That letter was in response to a January 31, 1997, letter from Debtor's counsel to GMP's counsel indicating that, even without a waiver, Debtor would be free from liability for retroactive wage increases and the GMP $300 Bonus. In other words, Debtor asserted that, following the closing, it would have no liability to GMP with respect to the CBA obligations that GMP waived as to New Anchor pursuant to the Agreement, while GMP asserted that those liabilities remained with Debtor and GMP would file a claim with respect thereto.

AFGWU has echoed GMP's disagreement with Debtor as to Debtor's post-assignment liabilities on the CBAs. (*Compare* AFGWU's Resp. at 5–6 *with* Letter from Stanger to Wittner of 2/5/97, at 1.)

## DISCUSSION

Although the Unions and Debtor agree that there is no issue of material fact, they disagree as to whether Code § 365(k)[3] serves to relieve Debtor of the payment obligations contained in the CBAs.

Debtor, in reliance on Code § 365(k), as referenced in and implemented by the terms of the APA, the Sale Order, and the Jan. 31 Order, argues that it has been relieved of liability for the obligations under the CBAs, which it assigned to New Anchor.

GMP presents three arguments in support of its view that it has a claim against Debtor: (1) unlike its relationship with New Anchor, as to Debtor GMP did not waive its right to pursue any claim for retroactive pay or bonuses; (2) the zero cure amounts listed in the Sale Order and the Jan. 31 Order do not absolve Debtor because the defaults took place after the Closing Date and therefore there were no cure amounts on the assumption and assignment date; and (3) Debtor's objection to post-petition payment of retroactive wage increases required by the CBAs, if successful, would constitute a unilateral mod-

3. Code § 365(k) provides:
   Assignment by the trustee to an entity of a contract or lease assumed under this section relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment.

ification of the CBAs in violation of Code § 1113.[4]

AFGWU's arguments boil down to this: Although AFGWU agreed with Owens and New Anchor to forego its right as against those two companies to the AFGWU $300 Bonus in exchange for the advancement of wage increases, AFGWU did not waive its right to proceed against Debtor for the AFGWU $300 Bonus and the $450–$650 Bonus.

4. Code § 1113 provides:

(a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section, "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without a good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

(d)(1) Upon the filing of an application for rejection the court shall schedule a hearing to be held not later than fourteen days after the date of the filing of such application. All interested parties may appear and be heard at such hearing. Adequate notice shall be provided to such parties at least ten days before the date of such hearing. The court may extend the time for the commencement of such hearing for a period not exceeding seven days where the circumstances of the case, and the interests of justice require such extension, or for additional periods of time to which the trustee and representative agree.

(2) The court shall rule on such application for rejection within thirty days after the date of the commencement of the hearing. In the interests of justice, the court may extend such time for ruling for such additional period as the trustee and the employees' representative may agree to. If the court does not rule on such application within thirty days after the date of the commencement of the hearing, or within such additional time as the trustee and the employees' representative may agree to, the trustee may terminate or alter any provisions of the collective bargaining agreement pending the ruling of the court on such application.

(3) The court may enter such protective orders, consistent with the need of the authorized representative of the employee to evaluate the trustee's proposal and the application for rejection, as may be necessary to prevent disclosure of information provided to such representative where such disclosure could compromise the position of the debtor with respect to its competitors in the industry in which it is engaged.

(e) If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. The implementation of such interim changes shall not render the application for rejection moot.

(f) No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

## 1. Waiver and Cure Amounts

■ I agree with Debtor that Code § 365(k) controls this proceeding and moots the issues of waiver and cure amounts. "Assignment by the trustee [or debtor in possession] to an entity of a contract or lease assumed under [Code § 365] *relieves* the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." Code § 365(k)

(emphasis added). At the closing, Debtor assumed and assigned the CBAs to New Anchor and Owens pursuant to the APA, the Sale Order, and the Jan. 31 Order. The Unions have not alleged that any breach occurred before the assignment; rather, no party disputes that every one of the payment obligations arose afterward.[5] Thus, the plain language of Code § 365(k) frees Debtor from those liabilities, the absence of a waiver notwithstanding. Although Debtor attempted to obtain waiver documents from the Unions and *neither GMP nor AFGWU agreed to waivers as to Debtor*, it in no manner conceded that the absence of such a waiver exposed it to liability. To the contrary, in its January 31 letter to GMP, Debtor expressly rejected the position that a waiver was needed for it to avoid liability. Debtor's attempt to obtain a written waiver was apparently a "belt and suspenders" approach to this matter.

It is a fundamental tenet of bankruptcy law that, with respect to the retention of liability upon assignment of executory contracts, the Code changes the common law rule:

> A party subject to a contractually created obligation ordinarily cannot divest itself of liability by substituting another in its place without the consent of the party owed the duty. While the assignee may be entitled to perform for the original obligor, the original obligor remains ultimately liable until discharged by performance or otherwise. Section 365(k) changes this common law rule and relieves the estate from all liability under the [executory contract] following assignment.

*In re Washington Capital Aviation & Leasing,* 156 B.R. 167, 175 n. 3 (Bankr.E.D.Va. 1993) (citation omitted). Thus, Debtor did not need to take action, such as obtaining a waiver, to divest itself of post-assignment liability.

Assumption and assignment under Code § 365 is analogous to a novation, as it involves the substitution of a new obligor, the assignee, for the old one. *See Wainer v. A.J. Equities, Ltd.,* 984 F.2d 679, 683 (5th Cir.

1993). The assignee becomes fully liable under the assigned contract and the debtor/assignor is relieved of any liability for post-assignment breaches. *See In re Lafayette Radio Electronics Corp.,* 9 B.R. 993, 1000 (Bankr.E.D.N.Y.1981) (citing Code § 365(k)). The Jan. 31 Order makes clear that, upon assignment of the CBAs to New Anchor and Owens, Debtor retained no liability except cure amounts, which were zero. New Anchor and Owens thus became Debtor's substitute obligors for all liabilities occurring post assignment under the CBAs.

### 2. No Violation of Code § 1113

GMP contends that, if the Court finds that Debtor does not have to pay for the retroactive wage increases, the Debtor will have succeeded in unilaterally modifying the provisions of the CBAs in violation of Code § 1113. "The debtor in possession ... may assume or reject a collective bargaining agreement only in accordance with the provisions of this section." Code § 1113(a). In GMP's eyes, since Debtor assumed the CBAs but effectively avoided liabilities in the process it has run afoul of Code § 1113 by not following the procedures mandated by that section.

While Code § 1113(a) plainly states that either an assumption or a rejection of a collective bargaining agreement may only be effected "in accordance with the provisions of section," the balance of Code § 1113 deals exclusively with procedures the debtor must follow to reject or modify collective bargaining agreements. The balance does not mention assumption, and it sets forth terms and provisions neither having a relationship to, nor making any sense if applied to, an assumption. As the court in *Mass. Air Conditioning & Heating Corp. v. McCoy,* 196 B.R. 659, 663 (D.Mass.1996), observed, the inclusion of the word "assumption" in subsection (a) reflects congressional carelessness, and Code § 365 still governs the assumption of a collective bargaining agreement.

Thus, given the plain language of § 1113(b)–(f) (directed in operation solely

---

5. GMP asserts that "the right to the retroactive wages did not arise until after the Debtor's assets

were sold to Consumers and Owens." (GMP Br. at 28.)

to termination or alteration of collective bargaining agreements), and the remedial purpose behind its enactment (directed to securing special procedures before a collective bargaining agreement may be rejected or modified), I find that the use of the term assumption in § 1113(a) was at most sloppy legislative drafting. The reference to assumption appears simply to call out the character of rejection by identifying it with its opposite. Otherwise, assumption plays no part in the purpose or operation of § 1113. Section 1113 is designed to provide additional procedural requirements for rejection or modification of collective bargaining agreements, and only to that degree supersedes and supplements the provisions in § 365.

By contrast, assumption of collective bargaining agreements continues to be governed by the provisions for executory contracts under § 365. Nothing in § 1113's plain language or legislative history indicates that Congress intended to alter Bildisco's holding that collective bargaining agreements are executory contracts. Because § 1113 speaks only to rejection, assumption of a collective bargaining agreement—like any other executory contract—remains within the province of § 365.

*Id.* (citations omitted). Because this proceeding deals with an assumption and assignment, not a rejection or modification, Debtor enjoys the benefits of Code § 365(k).

█ GMP seeks to twist the assumption and assignment into a modification, so that Code § 1113 would displace Code § 365 nonetheless. In support of this position, GMP points to the language of APA § 10.01(h)(ii), which made it a condition to New Anchor's obligation to close that either the retroactive wage adjustment be waived or this Court issue an order providing for the assumption and assignment without the acceleration of the deferred wage increases. According to GMP, the APA posits a modification to the CBAs, and therefore Code § 1113 comes into play. I am not persuaded by GMP's argument.

First, it is undisputed that the waiver is one element of a multi-provision Agreement entered into between GMP and New Anchor. It cannot be said that the Agreement in any fashion constituted an amendment or a modification of the CBAs that would implicate Code § 1113 because the Debtor is not a party to the Agreement and the Agreement states explicitly that its terms become effective only upon the occurrence of the closing, i.e., following the assumption and the assignment, when Debtor is no longer a party to the CBAs. In effect, the Agreement is a post-assignment modification to the CBAs, obviously not involving Debtor and therefore not implicating Code § 1113.

Second, with respect to the alternative condition of having this Court issue an order allowing the assumption and assignment without an acceleration of the deferred wage increases, the short answer is that no such order was ever entered, or even sought by Debtor. Had Debtor sought such an order, then, presumably, Code § 1113 would have been brought into play. However, the fact that it might have been implicated had the Debtor sought such relief does not make Code § 1113 applicable here.

Third, it is important to note that the condition set forth in APA § 10.01(h)(ii) is one of numerous conditions to Owens' and New Anchor's obligation to close; as provided by APA § 10.01, any one or all of those conditions could have been waived by Owens or New Anchor. The closing conditions set forth in APA § 10.01 were obviously intended to benefit Owens and New Anchor because, among other things, they were assuming contractual liabilities on a going forward basis. If, as GMP argues, certain of the CBAs' obligations that matured post assignment were intended to be Debtor's liabilities, one would have to ask why, pursuant to APA § 10.01, Owens and New Anchor, not Debtor, had the right to waive the required removal of such liabilities. This wording of the APA is entirely consistent with the plain language and effect of Code § 365(k). The APA provisions make it clear that, absent an agreement providing otherwise, New Anchor became fully subject to all the terms of the CBAs and no liability remained with Debtor. Had New Anchor elected to waive this condition, it would have been obligated to satisfy the very

claim that GMP now asserts against Debtor. Surely, GMP could not recover the same claim from both Debtor and New Anchor.

Also consistent with the effect of Code § 365(k) is the provision of the Agreement between GMP and New Anchor whereby New Anchor specifically "adopted" the CBAs, including "the recognition of past service of hourly employees covered by the [CBAs]." (Agreement at 1.) Although the parties to the Agreement then went on to carve out two elements of the liability for past service, the Agreement makes clear, consistent with Code § 365(k), that, absent an understanding otherwise between the two parties, New Anchor as assignee became the substitute obligor as to all liabilities arising post assignment under the CBAs.

GMP was not obligated to enter into the Agreement with New Anchor and thereby release rights which it had under the CBAs. It could have refused to make any concessions to New Anchor. If New Anchor did not elect to waive the APA § 10.01(h) condition to closing, then presumably the transaction would have aborted. Given the undisputed fact of Debtor's precarious financial condition at the time, GMP apparently saw the advantage of making the concessions in order to ensure the continued operation of the facilities, and the employment of its members, by a viable entity.

GMP relies on language from *In re Continental Airlines*, 125 F.3d 120 (3rd Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1049, 140 L.Ed.2d 113 (1997), in support of its position that Debtor has modified the CBAs in defiance of Code § 1113:

> The intent behind section 1113 is to preclude debtors or trustees in bankruptcy from unilaterally terminating, altering, or modifying the terms of a collective bargaining agreement without following its strict mandate. Moreover, the provision operates to preclude the application of other bankruptcy code provisions to the advantage of debtors and trustees to permit them to escape the terms of a collective bargaining agreement without complying with the requirements of section 1113.

*Id.* at 137 (citing *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989–90 (2d Cir.1990)). In *In re Continental Airlines* the court of appeals held that the bankruptcy court order entered pursuant to Code § 524 enjoining the union from pursuing certain collective bargaining rights ran afoul of Code § 1113 because the injunction effectively modified the collective bargaining agreement between the union and the debtor. *See* 125 F.3d at 138. That is not the situation here. The Debtor has not sought and this Court has not ordered any modification of the CBAs. Pursuant to Code § 365, New Anchor has assumed full liability for all the terms of the CBAs. The post-assignment modification of the CBAs was effected in an arm's-length Agreement between GMP and New Anchor. Since Debtor is not a party to the Agreement and this Court did not order the Agreement, it cannot be said that Debtor has circumvented the requirements of Code § 1113. Code § 1113 gives unions specific protection against modifications sought by debtors. Debtor sought no such modification here.

Based upon the foregoing, I will enter an order disallowing the claim of GMP and the claim of AFGWU.