

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-24-1999

# In Re: Amer. Flint Glass Wrkrs Union v. Anchor Resol. Corp.

Precedential or Non-Precedential:

Docket 99-5291, 99-5292

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"In Re: Amer. Flint Glass Wrkrs Union v. Anchor Resol. Corp." (1999). *1999 Decisions.* Paper 309.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/309

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 24, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 99-5291 and 99-5292

AMERICAN FLINT GLASS WORKERS UNION,
        Appellant in 99-5291

v.

ANCHOR RESOLUTION CORP., et al.,
        Debtor-Appellee.

GLASS, MOLDERS, POTTERY, PLASTICS & ALLIED
WORKERS INTERNATIONAL UNION,
        Appellant in 99-5292

v.

ANCHOR RESOLUTION CORP., et al.,
        Debtor-Appellee.

APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
DISTRICT JUDGE: Honorable Joseph J. Farnan, Jr.
(D.C. Civil Action No. 98-cv-00167)

Argued September 10, 1999

BEFORE: ROTH and WEIS, Circuit Judges, and
SHADUR,* District Judge

(Filed November 24, 1999)

_____

* Honorable Milton I. Shadur, Senior United States District Judge for the
Northern District of Illinois, sitting by designation.

Laura Davis Jones, Esquire
James L. Patton, Jr., Esquire
Young, Conaway, Stargatt &
 Taylor LLP
11th Floor-Rodney Square North
P.O. Box 391
Wilmington, DE 19899-0391

Kenneth Pasquale, Esquire
 (ARGUED)
Robin E. Keller, Esquire
Mark Wintner, Esquire
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038

Attorneys for Debtor-Appellee
Anchor Resolution Corp.

Theodore J. Tacconelli, Esquire
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

Louis J. Yoppolo, Esquire (ARGUED)
Shindler, Neff, Holmes &
 Schlageter, LLP
1200 Edison Plaza
300 Madison Avenue
Toledo, OH 43604

Attorneys for Appellant
American Flint Glass Workers Union

2

Erik C. Grandell, Esquire
Tomar, Simonoff, Adourian, O'Brien,
 Kaplan Jacoby, & Graziano
Mellon Bank Center
919 Market Street, Suite 1701
Wilmington, DE 19801

Douglas S. Stanger, Esquire
 (ARGUED)
Carl S. Yaller, Esquire
James S. Weiss, Esquire
Tomar, Simonoff, Adourian, O'Brien,
 Kaplan Jacoby, & Graziano
2111 New Road
Northfield, NJ 08225

Attorneys for Appellant
Glass, Molders, Pottery, Plastics &
Allied Workers International Union

Patricia A. Staiano, Esquire
Unites States Trustees
601 Walnut Street
Suite 950 West
Philadelphia, PA 19106

OPINION OF THE COURT

SHADUR, Senior District Judge:

Both of these appeals stem from the March 24, 1999 order of the United States District Court for the District of Delaware ("District Court Order," 231 B.R. 559 (D. Del. 1999)) affirming a February 4, 1998 bankruptcy court order ("Bankruptcy Court Order," 218 B.R. 330 (Bankr. D. Del. 1998)). Both Glass, Molders, Pottery, Plastics & Allied Workers International Union ("GMU") and American Flint Glass Workers Union ("AFU") (collectively "Unions") challenge the district court's affirmance of the bankruptcy court's grant of summary judgment in favor of Anchor Resolution Corporation ("Anchor"), rejecting bankruptcy claims filed against Anchor by Unions.

3

Unions' claims arose out of four collective bargaining agreements ("CBAs")--two with GMU and two with AFU-- that Anchor, as debtor in possession under Chapter 11, had assumed and then had purported to "assign," pursuant to a sale of substantially all its assets, to Consumers Packaging, Inc. ("Consumers") and Owens-Brockway Glass Container Inc. (collectively "Purchaser"). Consumers in turn assigned all of its rights and obligations arising out of the purchase (including its interest in the CBAs) to a newly-formed wholly-owned subsidiary that then changed its name to Anchor Glass Container Corp. ("New Anchor").

Both the bankruptcy court and the district court found that the sale of Anchor's assets to Purchaser was an assumption by Anchor of all four CBAs, coupled with a simultaneous assignment of the rights and obligations under the CBAs to Purchaser (218 B.R. at 336; 231 B.R. at 563). In addition, both courts below held that upon the February 5, 1997 closing of that sale, Code 365(k)1 served to relieve Anchor from all liability arising out of the CBAs, thus barring both Unions' claims. Finally, both courts held that no "modification" of the CBAs occurred to trigger application of Code 1113.

Because Anchor did not in fact assign the GMU CBAs cum onere (as is essential to a true assignment), we reverse as to that Union and remand for an order allowing its claims and for a determination of the priority of payment that such claims shall receive. As to AFU, however, the valid assignment of its CBAs requires affirmance.

Facts

In March 1996 Anchor and GMU negotiated two CBAs covering GMU's bargaining unit for the three-year period from April 1, 1996 through March 31, 1999. Effective September 1, 1996 Anchor and AFU similarly negotiated two three-year CBAs covering AFU's bargaining unit. Both sets of CBAs included current concessions to Anchor in recognition of, and to assist it in surviving in the face of, its shaky financial condition.

_____

1. All references to Bankruptcy Code provisions will take the form "Code --," omitting repeated reference to Title 11.

In its CBAs, GMU agreed to certain wage cuts in exchange for deferred supplemental payments or possible payments to be made by Anchor to certain employees over the course of the CBAs' three-year terms. Those commitments by Anchor comprised (1) the reinstatement and retroactive payment, if Anchor were to be sold, merged or transferred during the term of the CBAs, of wage increases that had been given up in the first two years of the CBAs ("GMU Retroactive Wage Claim"), (2) a $700 one-time payment to employees on the payroll as of April 1, 1996 and (3) a $300 Vitro stock bonus. In the aggregate, the value of those commitments came to $6,284,896.

As for AFU, it agreed to similar wage cuts in return for two supplemental payment obligations (together "AFU Bonus Claims"): (1) a $300 bonus (the "$300 Sign-on Bonus") and (2) further bonuses ranging from $450 to $650, depending on the job category of the particular employee. Those items had an aggregate value of $323,000.

Despite those concessions by the Unions, soon after negotiating the CBAs--on September 13, 1996--Anchor filed its voluntary bankruptcy petition under Chapter 11 (it had then signed a letter of intent for the sale of substantially all of its assets to competitor Ball-Foster Glass Container Co., L.L.C. ("Ball-Foster")). Anchor and Ball-Foster then negotiated and signed an October 4, 1996 asset purchase agreement, which was expressly made subject to higher and better offers.

In conjunction with its motion for the bankruptcy court's approval of the Ball-Foster agreement, Anchor filed a notice of assumption and assignment of certain executory contracts on November 1, 1996 ("Notice"). That Notice announced a November 22, 1996 hearing date to consider approval of the asset sale agreement, including Anchor's assumption and assignment of the contracts listed in the Notice ("Sale Hearing"). Anchor listed all four CBAs in the Notice, which set an objection deadline of November 15 (one week before the Sale Hearing). In addition the Notice provided that "the Sale Hearing may be adjourned from time to time without further notice other than an announcement in open court of the adjourned date or dates

5

at the originally scheduled sale hearing or any adjourned dates."

Because a better offer did come in, the Ball-Foster deal did not go forward. Instead, on December 20, 1996 the bankruptcy court entered its "Sale Order," approving Purchaser's bid as documented in a December 18, 1996 asset purchase agreement ("Agreement") between Anchor and Purchaser. Neither Union objected at that point to the sale of substantially all of Anchor's assets to Purchaser, including Anchor's proposed assumption and assignment of the CBAs.

On January 31, 1997 the bankruptcy court entered an order, assertedly under the auspices of Code 365, approving Anchor's assumption and assignment of the CBAs to Purchaser and providing that Anchor would thereby be relieved from further liability under the CBAs. Anchor and Purchaser closed the asset sale transaction on February 5, 1997 after each of GMU and AFU agreed to waive--but only against Purchaser--certain of its rights under the CBAs.2 After the closing of the sale neither Anchor nor Purchaser made any of the supplemental payments called for by the CBAs. New Anchor, however, promised a $.40 per hour wage increase. Unions filed claims against Anchor's bankruptcy estate for the value of the CBA-specified supplemental payments, and both lower courts disallowed Unions' claims.

Standard of Review

Jurisdiction initially vested in the bankruptcy court pursuant to 28 U.S.C. 157(b). Jurisdiction for the district court's review of the bankruptcy court's order was conferred by 28 U.S.C. 158(a). In turn, our appellate jurisdiction rests upon 28 U.S.C. 158(d) and 1291.

_____

2. GMU waived, as to Purchaser only, its members' rights to the retroactive wage increases that were to be triggered by reason of the sale of Anchor's assets to Purchaser, as well as its members' rights to the $300 Vitro stock bonus. AFU waived, as to Purchaser only, its members' rights to the $300 Sign-on Bonus. Both Unions refused to waive any rights against Anchor.

6

As taught by such cases as In re Krystal Cadillac
Oldsmobile GMC Truck, Inc., 142 F.3d 631, 635 (3d Cir.
1998):

>           In undertaking our review, we stand in the shoes of the
>           district court, applying a clearly erroneous standard to
>           the bankruptcy court's findings of fact and a plenary
>           standard to that court's legal conclusions.

Because this appeal involves review of the grant of
summary judgment, a purely legal determination, we apply
a de novo standard of review.

Code  365(k): Assignment "of a contract"

As the bankruptcy court correctly noted, in the absence
of a bankruptcy filing the common law rule as to
contractual assignments is exemplified by In re Washington
Capital Aviation & Leasing, 156 B.R. 167, 175 n.3 (Bankr.
E.D. Va. 1993)(citations omitted):

>           A party subject to a contractually created obligation
>           ordinarily cannot divest itself of liability by substituting
>           another in its place without the consent of the party
>           owed the duty. While the assignee may be entitled to
>           perform for the original obligor, the original obligor
>           remains ultimately liable until discharged by
>           performance or otherwise.

As the flip side of that common law rule, a novation occurs
when the obligee does consent to a substitution of a new
obligor for the old one, thus relieving the original obligor
from its duty to perform the novated obligations (see, e.g.,
La Salle Nat'l Bank v. Bachmann, 108 B.R. 1013, 1016
(N.D. Ill. 1989)).

In the bankruptcy context, however, Code  365(k)
changes the common law rule by effecting a novation by
operation of law whether or not the obligee consents to the
substitution (see, e.g., Wainer v. A.J. Equities, Ltd. 984 F.2d
679, 683–84 (5th Cir. 1993) (per curiam)). But consistently
with the basic concept of a contract's assignment, under
which every contractual assignee takes the entire bundle of
rights and obligations under the contract, such a forced

7

novation is dependent on just such a total undertaking by the assignee. Code 365(k)(emphasis added) provides:

> Assignment by the trustee3 to an entity of a contract or lease assumed under this section relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment.

Where Congress uses legal terms that have "accumulated settled meaning" under common law, it must be presumed (unless of course the statute dictates otherwise) that Congress meant to employ that established meaning (see, e.g., Field v. Mans, 516 U.S. 59, 69 (1995) and cases cited there). Hence we construe the terms in Code 365(k) to incorporate the general common law of assignments. In particular, we will follow the dominant consensus of common law jurisdictions, rather than the law of any particular jurisdiction (id. at 71).

That dominant consensus conforms to the clear meaning of the language involved: that an assignment of a contract as such involves a commitment by the assignee to perform all obligations under the contract, as well as to acquire all rights created by the contract.4 But here neither party to the sale transaction intended a true assignment of all rights and obligations created by the GMU CBAs. In fact, Anchor and Purchaser directly manifested their intent to assign less than all of the GMU CBA obligations--for Agreement 10.01(h)(ii) expressly placed this condition (among others) on Purchaser's obligation to close the sale:

> any retroactive (but not prospective) payments of wage increases forfeited in prior periods under such [collective bargaining] agreements as a result of the consummation of the transactions contemplated

_____

3. For purposes of this analysis, the term "trustee" is synonymous with "debtor in possession," and hence it encompasses debtor Anchor in this case (see Code 1107).

4. See, e.g., Restatement (Second) of Contracts 328 (1981); U.C.C. 2-210(4)(1998); 4 Arthur Linton Corbin, Corbin on Contracts 906, at 628-30 (1951 & 1999 supp. by Lawrence A. Cunningham and Arthur J. Jacobson); Art Metal Constr. Co. v. Lehigh Structural Steel Co.,116 F.2d 57, 58-59 (3d Cir. 1940).

> hereby shall have been waived or the Bankruptcy
> Court shall have issued an order, not subject to stay,
> that Seller may assign and the applicable Buyer may
> assume such collective bargaining agreements without
> any acceleration of the deferred wage increases
> negotiated under the current agreements.

It could not have been made more clear that Purchaser
had no intent, and certainly no obligation, to close on the
contemplated sale transaction unless it could shed any
responsibility for the payment to GMU's members of their
previously-bargained-for entitlement to receive retroactive
wages upon the closing. To put the matter most simply, the
GMU CBA that Purchaser was willing to (and did) accept
was not the same GMU CBA that Anchor had originally
negotiated, and had then assumed, post-bankruptcy.
Purchaser attempts to avoid that fatal flaw by telescoping
the two steps of assumption and assignment, but that is
wholly unpersuasive. Hence it is equally clear that no
assignment "of the [GMU] contract[s]" occurred such as to
trigger application of Code 365(k).

Because the Code provision thus did not intervene to
change the common law rule as to the GMU CBAs, that
rule and its consequence still obtain. Having shifted fewer
than all of the obligations (although it did assign all of the
rights) created by the GMU CBAs, Anchor remains liable on
those contractual obligations. We therefore reverse the
orders below disallowing the GMU claims and remand for a
proper disposition of those claims.

Code 1113: Modification of CBAs

There is another string to GMU's bow, woven from the
same line of analysis. By committing itself to Agreement
10.01(h), Anchor has run afoul of Code 1113(f):

> No provision of this title shall be construed to permit a
> trustee to unilaterally terminate or alter any provisions
> of a collective bargaining agreement prior to
> compliance with the provisions of this section.

In that respect we hold that when as here a debtor in
possession (the legal equivalent of a "trustee" for Code

1113(f) purposes) binds itself contractually to obtain a change in the legal relations created by a CBA as a condition precedent to closing a sale of substantially all of the debtor's assets, that constitutes an attempt to effect an alteration of the CBA. That being so, Anchor was required to comply with the procedures set out in Code 1113--and it did not.

Code 1113 and its procedures were enacted as a congressional overruling of NLRB v. Bildisco & Bildisco, 465 U.S. 513 (1984), in order to buffer CBAs against uncontrolled inroads whenever financial distress drives an employer into the bankruptcy courts in an effort to reorganize (In re Continental Airlines, 125 F.3d 120, 137 (3d Cir. 1997) and In re Roth Am., Inc., 975 F.2d 949, 956 (3d Cir. 1992), both citing Ionosphere Clubs, Inc. v. Air Line Pilots Ass'n Int'l, 922 F.2d 984, 989-90 (2d Cir. 1990)). But here Anchor and Purchaser have sought to misuse the Code in an effort to avoid the collective bargaining process that Congress deemed essential to the balance between labor and reorganizing debtors that it struck in Section 1113.

In effect, the Agreement's condition precedent stripped GMU of whatever bargaining power it might otherwise have had. Union representatives in a situation such as that presented by the Agreement here have a Hobson's choice between two evils: save the members' jobs minus the retroactive wages, or don't save the jobs at all. Because Anchor's attempted application of the assumption and assignment provisions operated here to frustrate congressional intent as expressed in Section 1113, we again find that those provisions did not operate to novate the retroactive wage obligations that were the subject of the condition precedent. This serves as an alternative basis for reversing the order disallowing GMU's Retroactive Wage Claim.

AFU's Bonus Claims

Neither of the just-completed lines of analysis, however, operates to preserve the AFU Bonus Claims. Agreement 10.01(h)(ii) did not make the closing of the sale contingent

10

on the waiver of those claims, unlike the retroactive wage payments to GMU members that Purchasers refused to commit to contractually. Instead the assumption of the AFU CBAs by Anchor and their assignment in turn to Purchaser were unconditional so far as the buyer-seller transaction was concerned (that was the express requirement of Agreement  9.05). And that being so, nothing in the special Code  1113(f) prohibition against altering a CBA without full compliance with the Code  1113 procedures operated to trump the Code  365(k) change of the common law rule as to all true assumption-and-assignment situations.

That being the case, there remains the argument that Anchor's non-adherence to the Code  1113 route as to the AFU CBAs leaves it liable despite Code  365(k)'s plain language. Code  1113(a) reads:

>    The debtor in possession...may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

Accordingly, the argument goes, Code  1113 and not  365 is the governing provision here. That contention rests on an extraordinarily thin reed: that the mere presence of the word "assume" in Code  1113(a) requires the application of that provision even where no modification or rejection of a CBA has occurred. But that argument is at odds with the plain reading of Code  1113, which (like the specific prohibition in Code  1113(f)) speaks only to what must be done by a party in bankruptcy to change--or to free itself entirely from--the terms of a CBA (Wien Air Alaska, Inc. v. Bachner, 865 F.2d 1106, 1111 n.5 (9th Cir. 1989); Mass. Air Conditioning & Heating Corp. v. McCoy, 196 B.R. 659, 662-63 (D. Mass. 1996)). It is surely no accident that Code  1113 is entitled "Rejection of collective bargaining agreements," although we of course recognize that such legislative captions are not part of the statute itself. We are persuaded that Code  365 and not Code  1113 is the applicable provision in the circumstances here.

So AFU's effort to give up a portion of its members' CBA rights (the $300 Sign-on Bonus) against Purchaser at the latter's request, while simultaneously reserving all of the AFU Bonus Claims against Anchor, fails. Anchor's outright

11

and unconditional assignment of the AFU CBAs to Purchaser triggered the statutory novation effected by Code 365(k).

Conclusion

We reverse the District Court Order affirming the Bankruptcy Court Order as to GMU and remand for a determination of the priority of payment to which GMU's claims--fully preserved against Anchor--are entitled. As to the AFU Bonus Claims, however, we affirm the District Court Order.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit

12