**In re TRICO STEEL COMPANY, L.L.C., INC., et al., Debtors.**

**Trico Steel Company, L.L.C.,\* Appellant,**

v.

**Cargill Incorporated, Appellee.**

**Adversary No. 01–1095–MFW.**

**CIV.A. No. 02–1500–JJF.**

United States District Court, D. Delaware.

Nov. 19, 2003.

---

\* The parties have not included JP Morgan Chase Bank in their designation of the caption in this action; however, it appears that JP Morgan Chase Bank is a Joint Appellant.

Michael R. Nestor, Esquire and Curtis J. Crowther, Esquire of Young Conaway

Stargatt & Taylor, LLP, Wilmington, DE, for Appellant, Trico Steel Company, L.L.C.

Eric L. Schnabel, Esquire of Klett Rooney Lieber & Schorling, Wilmington, DE, Of Counsel: William T. Russell, Jr., Esquire and Eric M. Albert, Esquire of Simpson Thacher & Bartlett, L.L.P., New York City, for Appellant, JP Morgan Chase Bank.

Philip Trainer, Jr., Esquire, Wilmington, DE, Christopher S. Stonchi, Esquire and Joseph C. Handlon, Esquire of Ashby & Geddes, for Appellee, Cargill, Incorporated.

## MEMORANDUM OPINION

FARNAN, District Judge.

Presently before the Court is an appeal by Appellants, Trico Steel Company, L.L.C. (the "Debtor") and JP Morgan Chase Bank ("JP Morgan Chase") (collectively, "Appellants") from the August 28, 2002 Order (the "Order") of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") granting summary judgment in favor of Appellee, Cargill, Incorporated ("Cargill"). For the reasons discussed, the Court will affirm the August 28, 2002 Order of the Bankruptcy Court.

## I. The Parties' Contentions

The facts of this action are set forth fully in the Bankruptcy Court's Opinion. *In re Trico Steel Company, L.L.C.*, 282 B.R. 318 (Bankr.D.Del.2002). By way of

brief background, the Debtor arranged to purchase 35,000 metric tons of pig iron from Cargill at the price of $120.50 per ton "CIFFO New Orleans, Louisiana." To fill the Debtor's order, Cargill purchased iron from another company and arranged for carriers to ship and deliver the iron to New Orleans. Thereafter, the Debtor entered into an agreement with Celtic Marine Corporation ("Celtic") to arrange for barge transportation for a portion of the pig iron from New Orleans to the Debtor's facility in Decatur, Alabama.[1] Celtic then arranged for the river carrier, Volunteer Barge & Transport, Inc. ("Volunteer"), to provide the actual barge transportation. When the pig iron arrived in New Orleans, the iron was loaded onto Volunteer's barges for transit to Decatur by stevedores hired by the Debtor. While the pig iron was in transit, Cargill learned that the Debtor was insolvent. Cargill then notified Celtic that it was exercising its right to stop the iron in transit due to the Debtor's insolvency. Shortly thereafter, Cargill filed an adversary action in the Bankruptcy Court seeking a declaration that it was entitled to immediate possession of the pig iron. Cross-motions for summary judgment were filed by the respective parties, and the Bankruptcy Court granted Cargill's motion for summary judgment and denied the Debtor's motion for summary judgment.

By their appeal, Appellants contend that the Bankruptcy Court erred in concluding that Cargill's right to stop the goods in transit under Section 2–702(1)[2] of the

---

1. The Debtor sold 10,000 metric tons of the pig iron to Primetrade AG ("Primetrade"). Cargill acknowledges that Primetrade's receipt of these goods cut off Cargill's right to stop delivery, and Cargill has not asserted any rights with respect to those goods in this action.

2. Section 2–702 provides in full:

§ 2–702. *Seller's Remedies on Discovery of Buyer's Insolvency.*

(1) Where the seller discovers the buyer to be insolvent he may refuse delivery except for cash including payment for all goods theretofore delivered under the contract, and stop delivery under this Article (Section 2–705).

(2) Where the seller discovers that the buyer has received the goods on credit while insol-

U.C.C. was not terminated, because the Debtor received the pig iron within the meaning of Section 2–705(2)(a) of the U.C.C.[3] Specifically, Appellants contend that the stevedores who unloaded the pig iron were agents of the Debtor who received the pig iron on behalf of the Debtor, and the pig iron reached its final place of delivery when it arrived in New Orleans. In the alternative, Appellants contend that the Bankruptcy Court erred in finding that Cargill's right to stoppage in transit under Article 2 of the U.C.C. was not subject to the priority rules of Article 9 of the U.C.C. In this regard, Appellants contend that JP Morgan had an Article 9 security interest in the pig iron that was superior to Cargill's Article 2 right to stop shipment of the goods in transit.

In response, Cargill contends that the Debtor did not receive the goods within the meaning of Section 2–705(2)(a) of the U.C.C., because the stevedores who unloaded the pig iron were not agents of the Debtor but merely links in transit. Cargill also contends that the pig iron did not reach its final destination until it arrived at the Debtor's facility in Decatur, Alabama. Cargill maintains that the term "CIFFO New Orleans" merely expressed the responsibilities of the parties with regard to title and risk of loss, and the parties never contemplated or intended New Orleans to be the final destination of the goods.

With respect to the Cargill's alternative argument, Cargill maintains that Article 9 of the U.C.C. is inapplicable, because Cargill's right to stoppage is not a security interest arising under Article 2 that is subject to the priority rules of Article 9. Because Article 9 is not applicable, Cargill maintains that it was permitted to exercise its stoppage rights under Article 2 of the U.C.C.

## II. Standard of Review

 The Court has jurisdiction to hear an appeal from the Bankruptcy Court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, the Court applies a clearly erroneous standard to the Bankruptcy Court's findings of fact and a plenary standard to its legal conclusions. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir.1999). With mixed questions of law and fact, the Court must accept the Bankruptcy Court's finding of "historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the trial court's choice and interpreta-

---

vent he may reclaim the goods upon demand made within ten days after the receipt, but if misrepresentation of insolvency has been made to the particular seller in writing within three months before delivery the ten day limitation does not apply. Except as provided in this subsection, the seller may not base a right to reclaim goods on the buyer's fraudulent or innocent misrepresentation of insolvency or of intent to pay.

(3) The seller's right to reclaim under subsection (2) is subject to the rights of a buyer in the ordinary course or other good faith purchaser under this Article (Section 2–403). Successful reclamation of goods excludes all other remedies with respect to them.

**3.** In pertinent part, Section 2–705 of the U.C.C. provides:

§ 2–705. *Seller's Stoppage of Delivery in Transit or Otherwise.*

(1) The seller may stop delivery of goods in the possession of a carrier or other bailee when he discovers the buyer to be insolvent (Section 2–702) . . .

(2) As against such buyer the seller may stop deliver until

(a) receipt of the goods by the buyer; or

(b) acknowledgment to the buyer by any bailee of the goods except a carrier that the bailee holds the goods for the buyer; or

(c) such acknowledgment to the buyer by a carrier by reshipment or as warehouseman; or

(d) negotiation to the buyer of any negotiable document of title covering the goods.

tion of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 642 (3d Cir.1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101–02 (3d Cir.1981)). The appellate responsibilities of the Court are further understood by the jurisdiction exercised by the Third Circuit, which focuses and reviews the Bankruptcy Court decision on a *de novo* basis in the first instance. *In re Telegroup,* 281 F.3d 133, 136 (3d Cir.2002).

## III. DISCUSSION

### A. *Whether The Bankruptcy Court Erred In Concluding That The Debtor Did Not Receive The Pig Iron Within The Meaning Of Section 2–705(2)(a) of the U.C.C.*

By their appeal, Appellants contend that the Debtor received the pig iron within the meaning of Article 2–705(2)(a) of the U.C.C., such that Cargill was precluded from exercising its rights under Article 2 to stop the goods in transit upon learning of the Debtor's insolvency. Appellants contend that the stevedores the Debtor hired were its agents, and that they exercised constructive possession over the pig iron by unloading and reloading it pursuant to the Debtor's instructions. Appellants also maintain that the final destination of the pig iron was New Orleans, and therefore, the Debtor was in receipt of the pig iron when it arrived in New Orleans.

After reviewing the conclusions of the Bankruptcy Court under a plenary standard of review, the Court concludes that the Bankruptcy Court correctly concluded that the Debtor did not receive the pig iron within the meaning of Section 2–705(2)(a) of the U.C.C. The Bankruptcy Court correctly found that the stevedores hired by the Debtor were merely interme-diaries or links in transit and not agents or employees of the Debtor who received the pig iron within the meaning of Section 2–705. The Bankruptcy Court also correctly concluded that New Orleans was not the final destination of the pig iron, because the Debtor did not intend for the pig iron to remain in New Orleans. Thus, the Bankruptcy Court correctly concluded that the Debtor never came into possession of the pig iron. The Bankruptcy Court thoroughly analyzed all of the issues raised by the parties in this regard, and the Court agrees with and adopts the analysis of the Bankruptcy Court. *Trico,* 282 B.R. at 322–27.

Appellants contend that the Bankruptcy Court's own conclusions regarding the "carriers by reshipment" provisions of the U.C.C. demonstrate that the Bankruptcy Court incorrectly concluded that the Debtor did not receive the pig iron. To this effect, Appellants contend that the Bankruptcy Court recognized that if the Debtor entered into a new contract with the Cargill carrier who shipped the good from Brazil to New Orleans (the "Brazil Carrier") in which the Brazil Carrier agreed to change the destination from New Orleans to Decatur or agreed to continue on from New Orleans from Decatur, then Cargill's right to stop shipment would have been terminated. (D.I. 7 at 17). Appellants maintain that it is

illogical for the Bankruptcy Court to have concluded that, where Trico took delivery in New Orleans, employed its own stevedores to unload the pig iron onto barges hired by Trico and operated by a new party, and arranged for those barges to reship the pig iron to Decatur, Cargill nevertheless enjoyed greater right to stop shipment than if Trico had simply entered into a new contract with

Cargill's own Brazil Carrier to change the point of delivery.

(D.I. 10 at 12)

Under Section 2–705(2)(c) of the U.C.C., a seller's right to stop the delivery of goods in transit is cut off, if a carrier acknowledges to the buyer that it is holding the goods for the buyer where that carrier is either a "carrier by reshipment" or a "warehouseman." As comment 3 to Section 2–705 explains "[a]cknowledgment by the carrier as a 'warehouseman' within the meaning of this Article *requires a contract of a truly different character from the original shipment,* a contract not in extension of transit but as a warehouseman." U.C.C. § 2–705, cmt. 3 (emphasis added).

After reviewing the Bankruptcy Court's opinion as it pertains to Section 2–705(2)(c), the Court is not persuaded by Appellants' argument. The Bankruptcy Court recognized the principles of Section 2–705(2)(c), but found no evidence that Celtic or Volunteer were "carriers by reshipment" or "carriers by warehousemen," and therefore concluded that Section 2–705(c)(2) did not apply. The Court agrees with the Bankruptcy Court's analysis of this issue and is not persuaded that it undercuts the Bankruptcy Court's conclusion that the Debtor was not in receipt of the goods such that Cargill's right to stoppage was cut off by operation of Section 2–705(c)(2). Accordingly, the Court will affirm the decision of the Bankruptcy Court that the Debtor did not receive the goods within the meaning of Section 2–705 of the U.C.C., and therefore, Cargill was not precluded from exercising its rights to stop the goods in transit.

**B. *Whether The Bankruptcy Court Erred In Concluding That Cargill's Right To Stoppage In Transit Was Not Subject To The Priority Rules Of Article 9 Of The U.C.C.***

Appellants next contend that the Bankruptcy Court erred in failing to recognize that JP Morgan had a perfected security interest in the pig iron under Article 9, and that this security interest was superior to Cargill's right to stoppage under Article 2. Even if it did not receive the goods within the meaning of Section 2–705, Appellants contend that the Debtor possessed sufficient rights in the pig iron to give JP Morgan a security interest. Appellants contend that comment 1 of Section 9–113 of the U.C.C. describes Cargill's right to stoppage as a right which is "similar to the rights of a secured party." Thus, Appellants maintain that the right to stoppage under Article 2 comes within the priority rules of Section 9–312. Because Cargill failed to obtain a purchase money security interest in the pig iron under Section 9–312, Appellants contend that JP Morgan's perfected security interest defeats any interest of Cargill.

After reviewing the Bankruptcy Court's opinion as it pertains to this issue, the Court concludes that the Bankruptcy Court correctly analyzed this issue, and the Court adopts the rationale and reasoning set forth by the Bankruptcy Court in this regard. As the Bankruptcy Court correctly recognized, the plain language of Article 9–113 does not apply to something "similar to a security interest," and the right to stoppage under Section 2–702 is not designated as a "security interest" under Article 2.[4] Thus, Cargill's right to stop the pig iron in transit is not subject to the priority rules of Article 9. *Trico,* 282 B.R.

---

4. Section 9–113 provides that:

A security interest arising solely under the Article on Sales (Article 2) or the Article on Leases (Article 2A) is subject to the provisions

of this Article except that to the extent that and so long as the debtor does not have or does not lawfully obtain possession of the goods

at 327. Having properly concluded that Article 9 did not apply, the Bankruptcy Court also correctly analyzed Cargill's rights under Article 2 of the U.C.C. to conclude that Cargill's right to stoppage is not subject to the rights of JP Morgan as a good faith purchaser with a floating security interest. *See e.g. Crocker Nat'l Bank v. Ideco Div. of Dresser Industries, Inc.*, 839 F.2d 1104, 1109 (5th Cir.1988); *In re Murdock Machine & Engineering Co. of Utah*, 620 F.2d 767, 774 (10th Cir.1980); *Ceres Incorporated v. ACLI Metal & Ore Co.*, 451 F.Supp. 921, 925 (N.D.Ill.1978).

Appellants contend that the Bankruptcy Court improperly distinguished *Kunkel v. Sprague Nat'l Bank*, 128 F.3d 636 (8th Cir.1997) and *Hong Kong & Shanghai Banking Corp. v. HFH USA Corp.*, 805 F.Supp. 133 (W.D.N.Y.1992), and that these decisions require reversal of the Bankruptcy Court's Order. The Court, however, is not persuaded by Appellants' argument. As the Bankruptcy Court recognized, *Kunkel* is distinguishable from the circumstances in this case. In *Kunkel*, the seller's right to stop the goods in transit was cut off under Section 2–702(2)(b) by the bailee's acknowledgment that he was holding the goods for the buyer. In these circumstances, the *Kunkel* court concluded that there was delivery of the goods to the buyer which terminated the seller's right to stop delivery. Unlike *Kunkel*, this case does not deal with the acknowledgment of a bailee, and Cargill stopped the delivery of the pig iron in transit *before* it was delivered to the Debtor.

As for the *Hong Kong* decision, the Bankruptcy Court correctly found that case to be inapposite. In *Hong Kong*, the

court concluded that a debtor may have rights in collateral that are sufficient for a lien to attach, even if the debtor did not have actual possession of the goods. However, the *Hong Kong* court did not address the issue of central importance here, i.e. the seller's right to stop the delivery of goods in transit. Accordingly, the Court will affirm the Bankruptcy Court's decision as it relates to its conclusions regarding the inapplicability of Article 9 and the superiority of Cargill's right to stop the goods in transit under Article 2 over any interest of JP Morgan as a good faith purchaser.

## IV. CONCLUSION

For the reasons discussed, the Court will affirm the Order of the Bankruptcy Court dated August 28, 2002.

An appropriate Order will be entered.

(a) no security agreement is necessary to make the security interest enforceable; and (b) no filing is required to perfect the security interest; and (c) the rights of the secured party on default by the debtor are governed (i) by the Article

on Sales (Article 2) in the case of a security interest arising solely under such Article or (ii) by the Article on Leases (Article 2A) in the case of a security interest arising solely under such Article.