United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 3, 2005**

Charles R. Fulbruge III
Clerk

REVISED JUNE 24, 2005

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 04-10495
_____

In The Matter Of: JACK E. PRATT, JR., Deceased,

Debtor,

- - - - - - - - - - - - - - - - - - - - - - - - - - -

CADLE COMPANY,

Appellant,

v.

JACK E. PRATT, JR.,

Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

Before REAVLEY, JOLLY, and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

In this bankruptcy appeal, a creditor contends that the
bankruptcy court should not have granted the debtor a discharge
because he failed to schedule certain assets and transferred or
concealed some of these assets.  The creditor also argues that
the bankruptcy court should have admitted its evidence about
transactions related to a specific piece of property.  Because we
find no clear error, we affirm the judgment.

Jack E. Pratt, Jr., a millionaire's son, had drug problems

1

and chronic debt for most of his life.  His business dealings were largely unsuccessful, and even as an adult, he consistently received money from his divorced parents.  His family agreed that Pratt was a spendthrift, and several family members indicated that he had a tendency to lie.

Pratt filed a bankruptcy petition in August 2000.  One of Pratt's bankruptcy creditors was appellant The Cadle Company ("Cadle"), who had purchased two judgments against him.  After Pratt filed his petition, Cadle brought an adversary action against Pratt in which it contended that Pratt's discharge in bankruptcy should be denied under 11 U.S.C. § 727 for making false statements in his schedules and Statement of Financial Affairs ("SOFA") and for concealing or removing assets.

In December 2000, four months after filing for bankruptcy, Pratt died of a heart attack.  His estate was substituted in his bankruptcy case,[1] and the adversary action proceeded.

The bankruptcy court conducted a two-day trial on the adversary case.  The trial evidence included two depositions of Pratt taken before his death as well as the testimony of Pratt's father ("Pratt Sr."), wife, and sister.  Pratt Sr.'s administrative secretary also testified.  At the conclusion of trial, the bankruptcy court made oral findings of facts and conclusions of law.  The court found that Cadle had failed to

---

[1]This opinion will use "Pratt" to refer both to Jack E. Pratt, Jr. and his estate.

meet its burden of proof to establish an exception from discharge. In particular, the court found that Cadle had failed to establish that Pratt's omissions of assets from his schedules and SOFA were made with fraudulent intent. The court thought instead that the evidence showed that the omissions were due to Pratt's drug problems and not fraudulent intent: "The concealment and removal of property amounts to a man who had drug problems for many years." Thus, the bankruptcy court granted Pratt a discharge.

Cadle appealed to the district court. The district court determined that the bankruptcy court did not clearly err in making its factual determinations and affirmed the judgment. This appeal followed.

**Denial of Discharge**

Cadle first argues that Pratt's discharge should have been denied under three subsections of 11 U.S.C. § 727. The relevant parts of § 727 provide,

> (a) The court shall grant the debtor a discharge, unless——
> . . .
>
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed——
> (A) property of the debtor, within one year before the date of the filing of the petition; or
> (B) property of the estate, after the date of the filing of the petition;

3

. . .

>(4) the debtor knowingly and fraudulently, in or in connection with the case——
>(A) made a false oath or account;

11 U.S.C. § 727.  Cadle contends that discharge should have been denied under §§ (a)(2)(A), (a)(2)(B), and (a)(4)(A).  These contentions are based on several different assets Cadle believes should have been included in Pratt's schedules and SOFA.  Cadle bears the burden of establishing the elements that would prevent discharge.  *See Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 177 (5th Cir. 1992).  Factual findings under this section are reviewed for clear error.  *See Hibernia Nat'l Bank v. Perez (In re Perez)*, 954 F.2d 1026, 1028 (5th Cir. 1992).

**Transfer of Assets**

To establish that discharge should be denied under § 727 (a)(2)(A), a creditor must show four elements: "(1) a transfer [or concealment] of property; (2) belonging to the debtor; (3) within one year of the filing of the petition; [and](4) with intent to hinder, delay, or defraud a creditor or officer of the estate."  *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 90 (5th Cir. 1989).  The intent to defraud must be actual, not constructive.  *Id*. at 91.  Nevertheless, "[a]ctual intent . . . may be inferred from the actions of the debtor and may be proven by circumstantial evidence."  *Id*.  In *Pavy v. Chastant (In re Chastant)*, we listed the factors that show actual intent to

4

defraud:

> (1) [T]he lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*Id*. (quoting *In re Schmit*, 71 B.R. 587, 590 (Bankr. D. Minn. 1987)).  There is, moreover, a presumption of fraudulent intent when a debtor transfers property to relatives.  *Id*. (citing *In re Butler*, 38 B.R. 884, 888 (Bankr. D. Kan. 1984)).  This court has indicated that once this presumption attaches, the burden shifts to the debtor "[to demonstrate] that he lacked fraudulent intent."  *Id*.

**False Oath**

Discharge may also be denied if the debtor makes a false oath in connection with his bankruptcy filings.  11 U.S.C. §(a)(4)(A).  A false oath has this effect since,

> Full disclosure of assets and liabilities in the schedules required to be filed by one seeking relief under Chapter 7 is essential, because the schedules 'serve the important purpose of insuring that adequate information is available for the Trustee and creditors without need for investigation to determine whether the information provided is true.'

*Beaubouef*, 966 F.2d at 179 (quoting *In re Urban*, 130 B.R. 340, 344 (Bankr. M.D. Fla. 1991)).  To establish a false oath under

5

this section, the creditor must show that "(1) [the debtor] made a statement under oath; (2) the statement was false; (3) [the debtor] knew the statement was false; (4) [the debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Id*. at 178. An omission of an asset can constitute a false oath. *Id.*

**Bank Accounts**

Cadle argues that Pratt failed to disclose two separate bank accounts: first, an account he held with his son and second, his wife's bank account, which Cadle contends Pratt used. Cadle also argues that Pratt's use of his wife's account amounted to concealment.

In 1997, Pratt opened an account at Texas Community Bank & Trust under two names—his own and that of his son, Jack Pratt III. Pratt used this account for household expenses. His son never deposited any money in the account. Pratt's estate now concedes that he should have disclosed this account in his bankruptcy filings. At the same time, he also contends that his failure to disclose was immaterial because the account had no money in it and had been entirely inactive for almost a year. He further argues that his failure to disclose the account was unintentional. The bankruptcy court concluded that although Pratt's failure to disclose the account was troubling, it was neither material nor intentional.

6

Cadle first challenges the bankruptcy court's materiality finding, contending that the court focused too much on the account's zero balance. As Cadle points out, we noted in *Beaubouef* that materiality does not depend on the asset's value: "In determining whether or not an omission is material, the issue is not merely the value of the omitted assets or whether the omission was detrimental to creditors." *Beaubouef*, 966 F.2d at 178 (quoting 4 COLLIER ON BANKRUPTCY, ¶ 727.04[1], at 727–59).

In fact, the *Beaubouef* debtor failed to list, among other things, his ownership of a worthless company. *Id*. The debtor argued that the worthlessness of the interest made it immaterial. *Id*. The court disagreed, stating "[t]he subject matter of a false oath is 'material' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Id*. (quoting *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984)). The court explained, "The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious." *Id*. (quoting *Chalik*, 748 F.2d at 618). Similarly, in *Johnson v. Baldridge (In re Baldridge)*, the bankruptcy court concluded that omission of bank accounts was material, even if

7

the accounts had little or no balance: "Few, if any, assets are more material to a consumer debtor's financial affairs than a bank account, for it is from that kind of asset that the creditors can discern not only an overall picture of the debtor's financial affairs, but also the details of the debtor's finances."  256 B.R. 284, 290 (Bankr. E.D. Ark. 2000).

Although the account Pratt held with his son might be material, Cadle has not presented a compelling case that Pratt had any fraudulent intent in failing to list it.  The bankruptcy court found, with regard to this account and other assets, "I can't say . . . that his motive was to hinder, delay or defraud or to commit a false oath that amounted to a substantial deprivation of property to the estate for creditors such as Cadle and others that the trustee represents."  Cadle can point to no specific evidence indicating that the bankruptcy court erred in making this finding.

Cadle also argues that Pratt should have disclosed his access to his wife's bank account and that he concealed his income by depositing checks into this account.  Pratt's wife, Elizabeth Pratt, testified that he gave her money to deposit in her own account for family expenses.  Elizabeth further testified that Pratt endorsed checks for her to deposit into her own account.  Additionally, Pratt deposited one check from Dallas General Life Insurance Company (Pratt's employer at the time)

8

into another account belonging to Elizabeth.[2]  These allegations all have the same shortcoming: they all concern deposits occurring more than one year before bankruptcy.

Cadle asserts that the theory of continuing concealment solves this problem.  Under this theory, when an asset is concealed—such as by nominally transferring it while retaining interest in it—before the one-year period, but the debtor's interest in the asset continues, § 727 may still apply.  *In re Olivier*, 819 F.2d 550, 554-55 (5th Cir. 1987).  In this case, unlike *In re Olivier*, Cadle has not presented evidence that Pratt's interest remained during the relevant time period.[3]  Cadle has not satisfied its burden of showing a continued interest.

Moreover, the bankruptcy court expressly found that Pratt lacked the intent to defraud his creditors about these assets. Here, too, Cadle does not present evidence that this finding is clearly erroneous.

**Cash Around the House**

---

[2] Elizabeth Pratt, on the other hand, testified that all the checks in her name from Dallas General were reimbursement for Dallas General expenses charged on her personal credit card.

[3]In *Olivier*, the debtors transferred title to their house in anticipation of a judgment being entered against them.  *Olivier*, 819 F.2d at 551.  This transfer occurred seven years before filing bankruptcy but after the transfer (to one of the debtors' mother), the debtors continued to live in the house, rent-free. *Id*.

Cadle next contends that Pratt concealed money from his creditors by keeping large amounts of cash around his house.[4]  As support, Cadle cites the following deposition testimony:

Q: So is it your testimony that sometime in the last six months, you have had between [$]10 to $20,000 in cash sitting around at home in a shoebox?
A: I guess that would be possible.
Q: Well I'm not—I don't want to talk about possibilities.  I want to talk about the truth.
A: Okay.  I don't recall a specific amount.
Q: Was it—have you had more than $10,000 in cash at your house at any one point in time in the last six months?
A: Yes.

Cadle insists that this testimony shows that Pratt routinely kept this amount of money at home to conceal it from his creditors.  Cadle further argues that this concealment probably continued after Pratt filed his petition.  In response to Cadle's argument, Pratt cites the testimony of trial witnesses who did not believe that Pratt ever kept this amount of money without spending it.  But even if he did, Pratt contends, Cadle has not shown that any concealment occurred.  Cadle asked if he had cash; Pratt answered, "yes."  Pratt contends that this shows no concealment.

In the end, while the conclusion that Cadle reaches—that Pratt kept large amounts of money hidden from his creditors—could perhaps be drawn from these facts, these facts do not require the court to reach this conclusion.  On this record, the district court's failure to find concealment and fraudulent

---

[4]Cadle does not contend that Pratt made a false statement by not disclosing the cash in any of his bankruptcy filings.

intent is not clearly erroneous.

**Children's Trusts**

Cadle also argues that Pratt made a false oath when he failed to disclose that he served as trustee for his children's trusts. Pratt's mother, Crystal Pratt, established these trusts in her will. Pratt Sr. was the original trustee of these trusts, but he resigned and appointed Pratt as substitute trustee in 1999.

Cadle first contends that Pratt lied when he failed to list these trusts in response to SOFA question 14: "List all property owned by another person that the debtor holds or controls." Neither side cites any relevant caselaw about whether a trustee should disclose a trust in response to this question. Pratt cites two bankruptcy court cases, both for generalities about holding property for another. Neither case deals with property held in trust. *See In re Sumerell*, 194 B.R. 818 (Bankr. E.D. Tenn. 1996); *Behrman Chiropractic Clinics, Inc. v. Johnson (In re Johnson)*, 189 B.R. 985 (Bankr. N.D. Ala. 1995). Nevertheless, we conclude that Pratt's failure to list his trustee status, assuming without deciding that it was required, was not material because this knowledge would not assist Pratt's creditors.

The argument about disclosure of Pratt's trustee position is secondary, however, to Cadle's main argument about the trusts. Cadle's principal argument about the children's trusts is that

Pratt abused his position as trustee. Cadle claims that Pratt improperly removed money from the trust accounts for his own purposes. Pratt Sr., on the other hand, testified that he saw no improper withdrawals. When Cadle raised the alleged misuse of trust assets, the bankruptcy court responded, "[t]hat's not your business." We agree. Whether Pratt misused the funds in his children's trusts is irrelevant to whether he made a false oath when he failed to list the trusts as someone else's property that he holds or controls. Thus, although the misuse of the trust assets might serve as the basis for a breach of fiduciary duty claim against Pratt, it does not provide a reason for denying him a discharge in bankruptcy under § 727.

**Pratt's Rights Under his Mother's Will**

After addressing Pratt's role in his children's trusts, Cadle turns to Pratt's own trust, which was also established by his mother's will, and his rights under that will. Pratt claimed to have received approximately $10,000 under Crystal Pratt's will. However, Cadle agues that under the will, Pratt was entitled to a significant distribution (originally around $300,000), followed by a complete distribution of the trust assets within 10 years. Cadle asserts that Pratt failed to disclose this entitlement. Cadle additionally contends that although he disclosed his interest in the trust, Pratt failed to list his right to distribution from the trust.

12

In response to Cadle's allegations about the will, Pratt contends that the distribution amount was reduced to account for loans of $281,585 his mother made him during her lifetime.[5] He also cites evidence in the record that distributions were actually made. Pratt therefore argues that he had no distribution right to disclose in the bankruptcy forms. And in fact, Cadle seems extremely hard pressed to try to explain how Pratt concealed, transferred, or lied about any of this.

In response to Cadle's allegations that Pratt should have disclosed his rights to distribution under the trust, Pratt argues that the trust was a discretionary, spendthrift trust, and that he therefore had no right to compel the trustee to make distributions.[6] Under a spendthrift trust, "the right of the beneficiary to future payments of income or capital cannot be voluntarily transferred by the beneficiary or reached by his or her creditors." *Shurley v. Tex. Commerce Bank—Austin, N.A. (In re Shurley)*, 115 F.3d 333, 337 (5th Cir. 1997). Furthermore, under the trust's terms, he had no interest in the trust's assets

---

[5]Evidence supports this offset amount.

[6]Bankruptcy Code § 541(c)(2) provides that "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable under this title." *See also Shurley v. Tex. Commerce Bank—Austin, N.A. (In re Shurley)*, 115 F.3d 333, 336—37 (5th Cir. 1997)("Section 541(c)(2) excludes 'spendthrift trusts' from the bankruptcy estate if such a trust protects the beneficiary from creditors under applicable state law.").

13

until they were distributed to him.

Pratt's trust argument focuses on *Bass v. Denney (In re Bass)*, 171 F.3d 1016 (5th Cir. 1999), in which we recognized that a spendthrift trust was protected from creditors. Specifically, the *Bass* court determined that the district court could not require a trustee of a discretionary, spendthrift trust to notify creditors 72 hours before making a distribution from the trust. *Id.* In so ruling, the court recognized that "[a] universal canon of Anglo-American trust law proclaims that when the trustee's powers of distribution are wholly discretionary, the beneficiary has no ownership interest in the trust or its assets until the trustee exercises discretion by electing to make a distribution to the beneficiary." *Id*. at 1028. Like the beneficiary, the court could not interfere with the trust: it could not "prevent or force the exercise of discretion by the trustee nor specify a particular exercise or otherwise interfere with or impinge on such discretion when it is expressly vested, without condition or limitation, under the terms of the trust instrument." *Id*. at 1028—29.

In this case, the trust documents indicated that distributions were left to the trustee's sole discretion. Thus, under *Bass*, Pratt had no right to force the trustee to make a distribution to him. He had no tangible interest in the assets until distribution. Pratt's use of *Bass*, however, emphasizes one

14

difference from this case.  In *Bass*, one principle underlying the court's decision was that the beneficiary could not interfere with the trustee's discretion.  But here, Cadle briefly contends that regardless of the terms of the trust, Pratt exercised actual control over the trust account.  Nevertheless, Cadle does not argue that this control removed the trust protections and cites no cases in support of its argument that Pratt's access to the account justified denial of discharge.  Moreover, this court has expressed skepticism that a beneficiary's control over a spendthrift trust can remove its protection from creditors. *Shurley*, 115 F.3d at 342 n.34.[7]

In short, Pratt disclosed the trust.  Cadle's insistence that Pratt should have disclosed his right of distribution, not just his trust, is unpersuasive.

**Retained Partnership Interest**

Cadle also contends that Pratt failed to disclose a retained interest in C.A. Pratt Partners, Ltd., a partnership Crystal Pratt formed for estate-planning purposes.[8]  On June 18, 1999,

---

[7]The *Shurley* court stated, "We assume without deciding that the court was legally correct in concluding that 'substantial control' can render a spendthrift or other protective trust subject to creditor claims. We note however that we do not believe that appellees have cited any Texas authority for this proposition."  *Shurley*, 115 F.3d at 342 n.34.

[8]Cadle also contends that Pratt's interest was diluted from 20% to 2.9609% in 1998.  It argues that there was no explanation for this dilution.  To the contrary, all the evidence indicated that the dilution occurred when, shortly after creating the

15

more than one year before filing for bankruptcy, Pratt entered into a contract under which he assigned his interest in the partnership. Cadle challenges how much of his rights Pratt actually transferred under that contract and, less directly, challenges the amount of consideration for the transfer.

As its first challenge, Cadle contends that under the terms of the contract, Pratt transferred all of his 2.906% interest in the partnership instead of the 2.9609% interest he actually owned. Thus, according to Cadle, Pratt actually retained a .0549% interest in the partnership, which should have been disclosed.

Although the bankruptcy court determined that no fraudulent intent could be drawn from this problem due to its "legalistic nature," Cadle disagrees, and argues that deposition testimony showed that Pratt knew exactly what he was doing. In this testimony, given a little over one month after the transfer, Pratt testified that he had not transferred any property worth over $300 in the previous four years. In a later deposition, he also denied that he had ever heard of C.A. Pratt Partners.[9] That

partnership, Crystal Pratt made a significant capital contribution, thereby diluting the interest of all the other partners. Regardless, this dilution cannot be the basis for denying discharge under § 727(a)(2)(A) because it occurred more than one year before Pratt filed his bankruptcy petition. Nothing indicates that Pratt retained any hidden interest after this dilution.

[9]According to Cadle, Pratt was fully aware of the transfer when he was examined during his bankruptcy proceeding.

16

Pratt lied about not transferring the asset,[10] however, does not prove that he intentionally hid an alleged .0549% interest in the partnership. Furthermore, Cadle presented no evidence that Pratt or anyone else knew, before being deposed, that the document stated 2.906 instead of 2.9609.[11]

Perhaps equally importantly, there is evidence that Pratt did not retain a .0549% interest at all, and that the transposition of the numbers was a clerical error in part of the contract. The woman who handled the paperwork for the transfer testified that it was a scrivener's error. The partnership's accountant testified that Pratt retained no ownership after the transfer. Evidence indicates that Pratt did not receive any K-1 forms from the partnership after the transfer. Furthermore, while the incorrect amount is listed in the recitals section of the contract, another part of the contract indicates that "Assignor hereby assigns to Assignee, and Assignee hereby acquires from Assignor, Assignor's entire interest in the Partnership." Therefore, the evidence indicates that the difference in the transfer amount was a typographical error and not a secretly retained interest.

As for Cadle's challenge to the amount of the consideration

_____

[10]The deposition occurred before Pratt filed his bankruptcy petition.

[11]The statute requires the false oath to have been made "knowingly and fraudulently."

17

for the transfer, the evidence is clear that the transfer occurred more than one year before Pratt's bankruptcy.  Cadle makes no continuing concealment argument to try to fit this transaction into the relevant time frame.  Cadle cites no evidence of any retained interest other than the alleged .0549%.

Thus, none of the evidence about the transfer of Pratt's partnership interest justifies overturning the bankruptcy court's findings concerning intent or its decision not to deny discharge.

**Northaven Property**

Finally, Cadle makes two arguments about property located at 6008 Northaven in Dallas.  It contends that Pratt made a false oath when he failed to disclose his continued interest in this property and also that the district court erred in excluding evidence about it.

Cadle's contentions are based on a complicated foreclosure. Pratt and Pratt Sr. owned the Northaven property, which was subject to a note.  The property also had judgment liens against it.  In April 1997, Pratt Sr. gave his assistant, Evelyn Johnstone, money to purchase the note from the bank that held it. She made the purchase, the bank executed a release of lien, and the note was transferred to her.

Pratt Sr. did not pay Johnstone under the note.  Johnstone, without ever obtaining a lien or making a demand on either of the Pratts, posted the property for foreclosure.  Pratt Sr. bought it

18

at the foreclosure sale on July 1, 1997.

Cadle argues that the foreclosure was not effective because no lien existed against the property at the time of foreclosure. At the time of the transfer to Johnstone, the bank holding the original note had released its lien. After the fact, Compass Bank executed a transfer of lien. Before the transfer of lien was recorded, however, Pratt Sr. sold the property.

The bankruptcy court found that, even if Pratt retained his interest because the foreclosure and sale were invalid, he did not know about it. Therefore, Pratt had no fraudulent intent when he failed to disclose any interest. This conclusion is supported by the record; even Cadle's description indicates that Pratt and his father were unaware of this problem with the foreclosure. For example, Cadle's brief concedes that Pratt Sr. "apparently believ[ed] he had good record title to the 6008 Northaven Property" at the time of the sale. Similarly, Cadle uses words like "technically" to describe Pratt's ownership of the property.[12]

Cadle presented no evidence that Pratt intentionally concealed the results of an invalid sale. What is more, it presented no evidence that Pratt was even aware of his "technical" ownership. The bankruptcy court did not err in its

_____

[12]Additionally, as the bankruptcy court noted, the issues about the Northaven property and its transfer had nothing to do with § 727. Section 727 does not provide a method of avoiding a transfer, for example.

19

rulings about the Northaven property.

**Conclusion**

In the end, Cadle has not shown that the district court erred in granting Pratt a discharge in bankruptcy. We affirm the judgment.

AFFIRMED.