# IN THE SUPREME COURT OF TEXAS

═══════════

No. 15-0502

═══════════

NOBLE ENERGY, INC., PETITIONER,

v.

CONOCOPHILLIPS COMPANY, RESPONDENT

═══════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS

═══════════════════════════════════════════

JUSTICE JOHNSON, joined by JUSTICE GREEN and JUSTICE GUZMAN, dissenting.

I disagree with the Court for essentially two reasons. First, the Court says that "the issue before us is not whether the bankruptcy proceedings were conducted as they should have been." *Ante* at ___. But that is precisely the issue. Alma was not authorized to assign the Exchange Agreement, which I agree was an executory contract, unless it was done pursuant to and in conformance with Bankruptcy Code section 365. 11 U.S.C. § 365.[1] Even Conoco agrees:

---

[1] *Otto Preminger Films, Ltd. v. Qintex Entm't, Inc. (In re Qintex Entm't)*, 950 F.2d 1492, 1495 (9th Cir. 1991) (holding that the sale of the debtor's assets did not include any executory contract unless the debtor first assumed that contract under section 365); *Chira v. Saal (In re Chira)*, 367 B.R. 888, 900 (S.D. Fla. 2007) (recognizing that section 365 is the exclusive remedy for the sale of executory contracts); *Tech Pharmacy Servs., Inc. v. RPD Holdings, LLC (In re Provider Meds, LLC)*, No. 13-30678, 2017 WL 213814, at *16 (Bankr. N.D. Tex. Jan. 18, 2017) (noting that section 365 is the exclusive means of effectuating assumption and assignment of executory contracts in bankruptcy); *Compton v. Mustang Eng'g Ltd. (In re MPF Holding U.S., LLC)*, 495 B.R. 303, 321 (Bankr. S.D. Tex. 2013) (recognizing that in the context of executory contracts, section 365 is the exclusive remedy available to parties wishing to sell property); *In re Taylor*, 198 B.R. 142, 167 (Bankr. D.S.C. 1996) (providing that section 365 is either an exclusive remedy or a necessary intermediate step before a sale of assets under section 363 is available); *In re Robinson Truck Line, Inc.*, 47 B.R. 631, 638 (Bankr. N.D. Miss. 1985) (holding that within the context of executory contracts under a Chapter 11 plan,

Alma could not have assigned *any* executory contract—the Exchange Agreement or anything else—in its bankruptcy to [Noble] under Texas law; it could only accomplish such assignment under [Bankruptcy Code] Section 365. "[S]ection 365 is the exclusive means of effectuating assumption and assignment of executory contracts in bankruptcy." *Compton v. Mustang Eng'g Ltd.* (*In re MPF Holding U.S. LLC*), 495 B.R. 303, 319 (Bankr. S.D. Tex. 2013); *see In re Qintex Entm't, Inc.*, 950 F.2d 1492, 1495–96 (9th Cir. 1991); *In re Taylor*, 198 B.R. 142, 167 (Bankr. D. S.C. 1996); *In re Robinson Truck Line, Inc.*, 47 B.R. 631, 638 (Bankr. N.D. Miss. 1985); *In re LHD Realty Corp.*, 20 B.R. 717, 719 (Bankr. S.D. Ind. 1982) (all holding that, within the Bankruptcy Code, Section 365 exclusively governs the assumption and assignment of executory contracts in bankruptcy proceedings).

Conoco Resp. Brief at 13 (citing 11 U.S.C. § 365). The Court says Alma did so, but it did not.

Second, the Exchange Agreement was not disclosed in the bankruptcy proceeding by Alma, either in its schedules or otherwise. The Court avoids that difficulty by saying Noble had constructive knowledge of the Agreement and Alma assumed it because of general language in the Asset Purchase Agreement (APA), the Bankruptcy Plan, and the bankruptcy court's Order:

> Section 10.8 of the Plan provides that executory contracts not specifically referenced were to be "assumed and assigned to [Noble]" unless rejected at closing. . . . "All . . . executory contracts . . . not . . . rejected . . . pursuant to this section," Section 10.9 states, shall be assumed by [Alma] and assigned to [Noble]. The Exchange Agreement was not specifically referenced in the Plan and was never rejected in any way permitted by the Plan and thus was assumed by Alma and assigned to Noble. Paragraph 15 of the bankruptcy court's Order clearly stated: "those Executory Contracts . . . proposed to be assumed and assigned to [Noble] pursuant to the Plan are ordered assumed and assigned to [Noble]. . . . The fact that Noble elected to close indicates that in its view, at least, the assignment of executory contracts under the Plan materially conformed to the APA.

*Ante* at ___ (alterations in original) (citations omitted). Again, the Court is mistaken.

---

section 365 is the exclusive remedy available to debtors).

2

The Court recognizes what is well established in bankruptcy law: section 365 does not authorize a debtor to assign an executory contract unless it first assumes the agreement and the assignee gives adequate assurance of performance. *See* 11 U.S.C. § 365 (f)(2). Under relevant bankruptcy authority construing section 365, general plan language such as that the Court references does not effect assumption of an undisclosed executory contract, approval of a putative assignee's adequate assurance of performance of it, and then its assignment.

The Court also points out that Noble acted as though it had assumed the Exchange Agreement by indemnifying Conoco in connection with previous post-bankruptcy claims. But past conduct "does not create a contract right that does not otherwise exist." *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 734 (Tex. 1981). And regardless of the circumstances surrounding any such actions by Noble and how it initially interpreted the bankruptcy documents, the actions do not alter whether Alma complied with the requirements of section 365 by expressly assuming the executory Exchange Agreement, Noble's providing adequate assurance of its performance, Alma's expressly assigning it, and the bankruptcy court's approval of all three.

Further, without citing authority except Conoco's argument, the Court says that the Plan language could have gone the other way and solved Noble's problems. That is, the Plan could have said "as reorganization plans often do, that all executory contracts not formally assumed and assigned by a certain date would be rejected." *Ante* at ___. It may be true that Alma's Plan could have contained such language, but that is not the question. The question is what actually happened here and how it plays out under section 365.

Under section 365, a trustee or debtor-in-possession "may assume or reject any executory contract." 11 U.S.C. § 365(a); *Gray v. W. Envtl. Servs. & Testing, Inc. (In re Dehon, Inc.)*, 352 B.R. 546, 558 (Bankr. D. Mass. 2006). "By permitting debtors to shed disadvantageous contracts but keep beneficial ones, § 365 advances one of the core purposes of the Bankruptcy Code: 'to give worthy debtors a fresh start.'" *Eagle Ins. Co. v. BankVest Capital Corp. (In re BankVest Capital Corp.)*, 360 F.3d 291, 296 (1st Cir. 2004) (quoting *Gannett v. Carp (In re Carp)*, 340 F.3d 15, 25 (1st Cir. 2003)). The decision to reject or assume an executory contract is "subject to the court's approval," 11 U.S.C. § 365(a), thus protecting the integrity of the proceedings and the best interests of all the concerned parties.

Only after a debtor has assumed an executory contract can the debtor assign it. 11 U.S.C. § 365(f)(2); *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238, 253 (5th Cir. 2006) ("According to § 365(f)(2)(A), assumption must precede assignment."); *In re Adelphia Commc'ns Corp.*, 359 B.R. 65, 71 (Bankr. S.D.N.Y. 2007) ("In order to assign an executory contract, a debtor in possession or trustee must assume it."). Bankruptcy courts have recognized that the Code does not preclude a debtor from neither assuming nor rejecting an executory contract. *In re Mirant Corp.*, 440 F.3d at 253 n.19. If an executory contract is neither assumed nor rejected, it remains in effect and passes with other property, that is, it "rides through" to the reorganized debtor. *Id.* Because such a contract is unaffected by the bankruptcy, the non-debtor party to the contract may seek redress outside of the bankruptcy context for any default by the debtor. *In re Dehon*, 352 B.R. at 561. Simply put, if the debtor wants to be relieved of the obligations of an executory contract, the contract must be disclosed and dealt with according to bankruptcy law and rules.

4

Conoco asserts, and the Court agrees that, pursuant to section 365, Alma assumed the entire Exchange Agreement and wholly assigned it to Noble. Noble advances two arguments in opposition. First, Alma did not disclose the Exchange Agreement during the bankruptcy proceedings as it was required to do by bankruptcy law. Second, an executory contract must be explicitly assumed in bankruptcy, and Alma did not explicitly assume the Exchange Agreement.

Regarding Alma's failure to disclose the Exchange Agreement during the bankruptcy proceedings, the Court concludes that "[a]s critical as disclosure in bankruptcy proceedings may be, we think it more critical that parties to bankruptcy proceedings and others have confidence that reorganization plans and court orders will be interpreted and enforced according to their plain terms." *Ante* at ___. Of course the Court is correct that parties to bankruptcy proceedings must have confidence in proceedings, plans, and court orders. But that confidence only comes if the proceedings are transparent and bankruptcy law and requirements are strictly complied with. Otherwise, the proceedings become a matter of gamesmanship—how opaque can a debtor's filings and disclosures be and how many omissions can be made without consequences to the debtor seeking relief and other parties such as Conoco with knowledge of the opaqueness and who ostensibly are benefitted? In any event, the Court's statement is counter to the position of federal courts regarding full and complete disclosure, as is discussed below. *See, e.g.*, *Zurich Am. Ins. v. Tessler (In re J.A. Jones, Inc.)*, 492 F.3d 242, 249, 252 (4th Cir. 2007) (holding that even though a Chapter 11 Plan of Liquidation had been confirmed, a creditor was not bound by the terms of the settlement because the debtor had not included the creditor on the schedule of creditors as required by 11 U.S.C. § 521).

Not only is the Court's decision counter to bankruptcy authority, it is manifestly inequitable. The Court's decision prejudices Noble, who was not notified by Alma of the indemnity obligation in the Exchange Agreement. And the Court's decision benefits the direct parties to the Exchange Agreement—Conoco and Alma—who negotiated, entered into, and accepted its risks in a presumably arms-length, fully-vetted business transaction, then allowed it to ride through the bankruptcy proceedings without notice to the trustee, the bankruptcy court, or the entities considering purchasing Alma's assets. Conoco benefits by having a claim against Noble instead of the reorganized Alma, and the reorganized Alma benefits by escaping liability for bankrupt Alma's failure to comply with bankruptcy law by not disclosing an executory contract. The Court says that "Noble knew from the plain terms of the APA, the Plan, and the Order that it could be assigned executory contracts not specifically listed." *Ante* at ___. But as discussed below, Noble explicitly limited its assumption of Alma's liabilities in the APA and Noble should have been able to rely on Alma's bankruptcy schedules without the need to conduct its own investigation into whether those schedules were accurate. *See Popgrip, LLC v. Brown's Chicken & Pasta, Inc. (In re Brown's Chicken & Pasta, Inc.)*, 503 B.R. 86, 94 (Bankr. N.D. Ill. 2013); *see also Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005).

As for Alma's failure to disclose the Exchange Agreement, a debtor is required to disclose assets, liabilities, and executory contracts on particularized schedules. 11 U.S.C. § 521(a)(1)(i); FED. R. BANKR. P. 1007(b)(1)(C); *see* Official Bankruptcy Form 6, Schedule G ("Describe *all* executory contracts of *any* nature and all unexpired leases of real or personal property [and] [s]tate nature of debtor's interest in contract, i.e., 'Purchaser,' 'Agent,' etc." (emphasis added)). Alma did not

6

disclose the Exchange Agreement as an executory contract. And bankruptcy courts have firmly put both the obligation of full disclosure and the risks of non-disclosure on the debtor. *See Diamond Z Trailer v. JZ L.L.C. (In re JZ L.L.C.)*, 371 B.R. 412, 417 (B.A.P. 9th Cir. 2007) ("It is settled that the debtor has a duty to prepare these bankruptcy schedules and statements 'carefully, completely, and accurately' and bears the risk of nondisclosure." (quoting *Cusano v. Klein*, 264 F.3d 936, 946–49 (9th Cir. 2001))); *Burnes v. Pemco Aeroplex*, 291 F.3d 1282, 1286 (11th Cir. 2002) ("Bankruptcy courts also rely on the accuracy of the disclosure statements when considering whether to approve a no asset discharge. Accordingly, 'the importance of full and honest disclosure cannot be overstated.'" (quoting *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996))); *In re Colvin*, 288 B.R. 477, 481 (Bankr. E.D. Mich. 2003) (collecting cases and concluding that disclosure obligations of debtors "are at the very core of the bankruptcy process and meeting these obligations is part of the price debtors pay for receiving the bankruptcy discharge").

The Court seems to conclude that Alma's failure to disclose the Exchange Agreement as required by the Bankruptcy Code was excused because Noble had "constructive knowledge" of the agreement. *Ante* at ___. But "constructive knowledge" is not applicable in the bankruptcy context. Debtors are statutorily required to explicitly disclose assets, liabilities, and executory contracts so all the parties involved, including the bankruptcy court, can rely on the disclosures. *See Burnes*, 291 F.3d at 1286 (noting that creditors and bankruptcy courts rely on the accuracy of disclosure statements). "Schedules serve the important purpose of insuring that adequate information is available for the Trustee and creditors *without need for investigation* to determine whether the information provided is true." *In re Pratt*, 411 F.3d at 566 (emphasis added) (internal quotations

7

omitted); *see also Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners (In re Tex. Rangers Baseball Partners)*, 498 B.R. 679, 704 (Bankr. N.D. Tex. 2013) ("Under the Bankruptcy Rules, notice must be given in a bankruptcy case to counter-parties to the contract *and to other parties in interest* of a debtor-in-possession's contemplated decision to either reject or assume an executory contract." (emphasis added)).  Further, "[p]arties who purchase assets from bankruptcy estates should be able to rely on debtors' Schedules and Statements of Financial Affairs.  Otherwise, competent, financially able purchasers will shun a bankruptcy process that requires them to speculate about what they are asked to purchase."  *In re Brown's Chicken & Pasta*, 503 B.R. at 94 (determining that information in a letter and monthly operating report was not sufficient to put an asset purchaser on notice of the existence of a franchise agreement that was not included in the bankruptcy schedules).

Further, in concluding that Noble had constructive knowledge of the Exchange Agreement, the Court cites cases and statutes regarding notice based on recorded instruments. *Ante* at ___ n.10. But none of these are applicable in a bankruptcy proceeding where the requirements for assigning an executory contract are explicitly spelled out in the Bankruptcy Code.  And finally, none of these address whether the purchaser of an oil and gas lease was put on notice of a *liability* not addressed in the purchase contract.  *See Cooksey v. Sinder*, 682 S.W.2d 252, 253 (Tex. 1984) ("Because Cooksey's deed was properly recorded and within the chain of title of the Sinder parents and Tierra Buena, they had legal notice of the lien and thus took the property subject to that lien.  This defeats their innocent purchaser defense."); *cf. Regency Advantage Ltd. P'ship v. Bingo Idea-Watauga, Inc.*, 936 S.W.2d 275, 278 (Tex. 1996) (holding that the assignee of a lease was not liable on a

commission agreement in the lease because to be liable "it must have expressly assumed such liability").

Alma did not disclose the Exchange Agreement, and in the bankruptcy context, the risk of a bankruptcy debtor's failure to disclose falls on the debtor. *See, e.g.*, *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 785 (9th Cir. 2001) (holding that a debtor was judicially estopped from asserting a claim that had not been disclosed in bankruptcy because "the integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets. . . . The interests of both the creditors, who plan their actions in the bankruptcy proceeding on the basis of information supplied in the disclosure statements, and the bankruptcy court, which must decide whether to approve the plan of reorganization on the same basis, are impaired when the disclosure provided by the debtor is incomplete." (quoting *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 208 (5th Cir. 1999))); *In re JZ L.L.C.*, 371 B.R. at 417 ("It is settled that the debtor . . . bears the risk of nondisclosure."); *Sanderson v. Ptasinski (In re Ptasinski)*, 290 B.R. 16, 26 (Bankr. W.D.N.Y. 2003) (denying debtors' discharge based on their failure to disclose assets and noting that "the benefits received by an honest debtor in a bankruptcy case, including a discharge of all dischargeable debts, a 'fresh start,' are extraordinarily disproportionate to the few demands and expectations [of full disclosure] placed upon a debtor by the Bankruptcy Code and Rules"). Otherwise, a debtor would be incentivized to conceal information. *Superior Crewboats Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.)*, 374 F.3d 330, 336 (5th Cir. 2004) ("The Hudspeaths had the requisite motivation to conceal the claim as they would certainly reap a windfall had they been able to recover on the undisclosed claim without having disclosed it to the

9

creditors. Such a result would permit debtors to '[c]onceal their claims; get rid of [their] creditors on the cheap, and start over with a bundle of rights.'" (alterations in original) (quoting *Payless Wholesale Distribs., Inc. v. Alberto Culver (P.R.) Inc.*, 989 F.2d 570, 571 (1st Cir. 1993))); *Burnes*, 291 F.3d at 1288 ("Allowing [the debtor] to back-up, re-open the bankruptcy case, and amend his bankruptcy filings, only after his omission has been challenged by an adversary, suggests that a debtor should consider disclosing potential assets only if he is caught concealing them.").

Alma's failure to disclose the Exchange Agreement factors into the ultimate question of whether Alma assumed and assigned it in accordance with section 365's requirements. Under section 365, an executory contract may be assigned only after (1) it has been assumed by the debtor, (2) the assignee has provided adequate assurance of future performance, and (3) the bankruptcy court has approved. 11 U.S.C. § 365(a), (f)(2). Noble argues that Alma did not explicitly assume the Exchange Agreement and an executory contract must be explicitly assumed in bankruptcy—it cannot be assumed by implication. *See Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 401 (5th Cir. 2001) (stating that an executory contract may not be assumed by implication). This requirement of explicit assumption is closely tied to the requirement of court approval.

> Congress enacted section 365(a) as part of the Bankruptcy Code of 1978, making court approval of [executory contract rejection or assumption] obligatory for the first time. . . . The predecessor to section 365(a) . . . did not explicitly require judicial approval [of assumption or rejection decisions] . . . . In adopting a requirement of court approval, Congress overruled precedent that allowed trustees to show by informal conduct that they had either assumed or rejected [executory contracts].

*In re Dehon*, 352 B.R. at 560 (alterations in original) (quoting *Thinking Machs. Corp. v. Mellon Fin. Servs. Corp. (In re Thinking Machs. Corp.)*, 67 F.3d 1021, 1026 (1st Cir. 1995)).

As noted above, the Court concludes that the Exchange Agreement was assumed in the bankruptcy proceeding based on bankruptcy plan language providing that "executory contracts not specifically referenced were to be 'assumed and assigned to [Noble]' unless rejected at closing." *Ante* at ___ (alteration in original) (citing Plan § 10.8). But the Court does not explain how the bankruptcy court could have approved the assumption as required by section 365 when the contract's existence was known only to Alma and Conoco and undisclosed by either of them in the bankruptcy to other parties, the trustee, or the court. Rather, the Court says that the bankruptcy court's approval of the plan was "perfectly understandable" even though it did not know the agreement existed because "Section 365 does not impose an obligation on the court to conduct an independent investigation." *Ante* at ___ n.68. I completely agree that section 365 does not require a court to conduct an independent investigation. But that point, again, goes back to Alma's responsibility to disclose the agreement because bankruptcy courts rely on disclosure statements. *See Burnes*, 291 F.3d at 1286 ("Bankruptcy courts also rely on the accuracy of the disclosure statements . . . .").

Nor does the Court explain how the bankruptcy court could have intended its order specifying that Noble has "provided adequate assurance of future performance of all Executory Contracts and unexpired leases being assigned to it" to include the undisclosed Agreement when neither the court nor Noble knew of the contract. Order § 15. That is because there is no reasonable, legally sound explanation for it. Rather, as was noted by the court in *In re Parkwood Realty Corp.*, a bankruptcy court interpreting general language approving assumption of an undisclosed executory contract and finding in its order that adequate assurance of future performance has been provided when the

11

contract was not disclosed and was unknown to the court, is pure fiction. 157 B.R. 687, 690–91 (Bankr. W.D. Wash. 1993).

Court approval of an executory contract's assumption has been described as "an indispensable step in the process" and an "explicit rule[] laid out by Congress." *In re A.H. Robins Co.*, 68 B.R. 705, 710 (Bankr. E.D. Va. 1986) ("Judicial approval of a motion to assume is critical, as issues of cure of default, adequate assurance of future performance and compensation for pecuniary loss sustained as a result of default are matters of law left solely to the court's resolve."). Assumption of an executory contract "elevates a prepetition liability to a postpetition liability, but also entitles the nondebtor party to first priority status. Court approval thus provides protection to the unsecured creditors whose claims could be prejudiced by potentially burdensome contracts—ones that may have driven the business into bankruptcy in the first place." *Mason v. Official Comm. of Unsecured Creditors (In re FBI Distribution Corp.)*, 330 F.3d 36, 45 (1st Cir. 2003).

As noted above, bankruptcy courts have consistently concluded that the assumption or rejection of an executory contract under section 365 cannot be approved in bankruptcy if the contract has not been disclosed. In *In re Parkwood Realty Corp.*, a bankruptcy plan provided that "[a]ll other executory contracts or unexpired leases of [the debtor] which have not been previously rejected shall be deemed rejected on the Effective Date." 157 B.R. at 689. The bankruptcy court concluded that an undisclosed executory contract was not rejected based on this language because section 365 requires "actual consideration by the court," and under section 365's requirements, "to approve the

12

rejection of an unidentified contract results in purely fictitious compliance with the Code." *Id.* at 689–91.

Similarly, in *In re Golden Triangle Film Labs, Inc.*, a confirmed plan stated "all executory contracts and unexpired leases of the Debtor shall be assumed by (and, to the extent necessary, assigned to) reorganized Golden Triangle Film Labs, Inc. . . . except any executory contracts and unexpired leases that are subject of separate motions to reject." 176 B.R. 608, 609 (Bankr. M.D. Fla. 1994). The court determined that the unexpired lease at issue was not assumed under this language because section 365 requires approval from the court and "[t]his Court is unwilling to accept the proposition that the entry of an Order of Confirmation of a Plan which contains such unspecific reference to unexpired leases and executory contracts would be sufficient to comply with the requirements of § 365(a) of the Code." *Id.* at 610.

The Fifth Circuit also recognized that interpreting the phrase "[a]ll . . . executory contracts, other than contracts with or for the benefit of employees, agent[s] or brokers, *not* rejected prior to time [sic] set forth herein *will be assumed*" as providing for the assumption of an undisclosed contract "would be inconsistent with § 365(a), which requires court approval." *In re O'Connor*, 258 F.3d at 401 (alterations in original). The Court discounts the Fifth Circuit's labeling of the plan language in that case as "boilerplate" as "no more than an aside," and not the court's actual holding. *Ante* at ___. But regardless of whether the plan language is labeled "boilerplate," the ultimate issue is whether the proceedings complied with section 365's requirements, specifically that a bankruptcy court must approve both any assumptions and any rejections. And in bankruptcy proceedings, a general statement such as is contained in the bankruptcy court order here simply does not approve

13

or disapprove of assumption of an undisclosed executory contract that the court has not expressly considered.

The Court references two cases in which plan language similar to the language in this case was upheld. *Ante* at ___ (quoting *Dataprose, Inc. v. Amerivision Commc'ns (In re Amerivision Commc'ns, Inc.)*, 349 B.R. 718 (B.A.P. 10th Cir. 2006); *Tenucp Prop. LLC v. Riley (In re GCP CT Sch. Acquisition, LLC)*, 429 B.R. 817 (1st Cir. 2010)). But in both of those cases, as the Court's quotes reflect, the focus was on whether the parties in interest had adequate notice of the assumption or rejection of the executory contract. *In re GCP CT Sch. Acquisition*, 429 B.R. at 828–29 ("[T]he question is not only whether the language contained within the plan or motion is sufficiently explicit, but whether the notice (service of the relevant documents) under the circumstances was adequate. Thus, the validity of any language depends upon notice and clarity and the overall information provided to the *parties in interest*." (emphasis added)); *In re Amerivision Commc'ns, Inc.*, 349 B.R. at 722 ("The Court does not invalidate boilerplate language per se. The validity of any language depends upon notice and clarity and the overall information provided to the *parties in interest*." (emphasis added)). Here, as the asset purchaser, Noble was clearly a party in interest. But it was provided *no* information with regard to the Exchange Agreement. The validity of the Plan language as to the Executory Agreement depends upon the notice and information provided—or rather not provided—to Noble in the bankruptcy proceedings. Based on explicit section 365 requirements, I disagree that through the general Plan language Alma assumed the undisclosed Exchange Agreement, Noble gave adequate assurance of performance of it, and Alma assigned it to Noble.

14

Generally, if a debtor does not assume or reject an executory contract in bankruptcy, the contract "rides through" the bankruptcy and passes to the reorganized debtor, leaving the nondebtor's claim to survive the bankruptcy. *In re Mirant Corp.*, 440 F.3d at 253 n.19. The validity of Noble's purchase of Alma's interest in the Johnson Bayou Field during Alma's bankruptcy is not being challenged. To determine what that purchase means for the separate contractual indemnity obligation, there are three applicable bankruptcy cases that have addressed a debtor's failure to follow the specific requirements of section 365 when attempting to dispose of an executory contract.

In *American Flint Glass Workers Union v. Anchor Resolution Corp.*, the debtor, Anchor, assumed and then "purported" to assign an executory contract under section 365 to an asset purchaser. 197 F.3d 76, 78 (3d Cir. 1999). Under the language of the asset purchase agreement, however, the buyer was to assume only some of the debtor's obligations under that contract. *Id.* at 81. The court concluded that this was not a true executory contract assignment because the debtor did not assign it *cum onere*—"[h]aving shifted fewer than all of the obligations (although it did assign all of the rights) created by the [executory contract], Anchor remains liable on those contractual obligations." *Id.* at 78, 81. In coming to this conclusion, the court looked at the underlying sales contract and noted that "here neither party to the sale transaction intended a true assignment of all rights and obligations. . . . [The contract the] Purchaser was willing to (and did) accept was simply *not* the same [contract] that Anchor had originally negotiated, and had then assumed." *Id.* at 81. The court concluded that because Anchor had not assigned the contract, the claims against it for priority payments by the nondebtor party to the executory contract were fully preserved. *Id.* at 83.

15

In another case, the Third Circuit Court of Appeals addressed an executory contract in which Tenet Health System purchased collective bargaining agreements from the bankruptcy debtor, Allegheny. *Tenet Healthsystem Phila., Inc. v. Nat'l Union of Hosp. & Health Care Emps. (In re Allegheny Health, Educ. & Research Found.)*, 383 F.3d 169, 172 (3d Cir. 2004). The agreements were listed on the schedule of "Assumed Contracts" that were to be assumed by Allegheny and assigned to Tenet. *Id.* However, the asset purchase agreement provided that Tenet only assumed obligations arising after the closing of the sale. *Id.* The nondebtor party to the collective bargaining agreement, the union, asserted that Tenet was refusing to abide by the terms of the collective bargaining agreements by failing to pay employees for sick leave that accrued before the bankruptcy sale. *Id.* at 173. The court concluded that under the asset purchase agreement Tenet was not liable for any liabilities arising before the sale. *Id.* at 178. The court determined that while Allegheny might be liable on the collective bargaining agreements, *American Flint Glass* "does not provide authority for holding Tenet liable for the parts of the collective bargaining agreements that it declined to assume." *Id.* at 177. The court also pointed out that "[t]o the extent that Tenet has been able to enjoy the benefits of the collective bargaining agreements without having to pay for the sick leave that accrued under them, [the union] has itself to blame" because it failed to object to the asset purchase agreement containing the "division of responsibility between Tenet and Allegheny." *Id.*

The Court states that *In re Allegheny* is contrary to Noble's position because the non-debtors in that case had an existing right that was due at the time of bankruptcy, while in this case, indemnity was not due until a covered liability was established. *Ante* at ___. But the Court fails to explain away the discussion in *In re Allegheny* of the plan language which assigned the agreement to Tenet

16

and the contrary asset purchase agreement language in which Tenet did not assume all obligations in the agreement.

Finally, in *In re Dehon*, the court addressed executory contracts that were listed as assets to be transferred, but not as executory contracts to be assumed and assigned. 352 B.R. at 562. The asset purchase agreement included all the debtor's "right, title, and interest in and to all agreements." *Id.* at 552. The purchaser of the assets and the non-debtor parties to the executory contracts continued to perform under the contracts after the bankruptcy. *Id.* at 553. When the bankruptcy plan administrator sought to recover preferential payments made to the non-debtor parties, those parties argued that the contracts had been assumed by the debtor under section 365. *Id.* at 555. The court disagreed, noting that neither the debtor nor the plan administrator had requested assumption of the contracts, no assumption was approved by the court, and nothing indicated the debtor intended to assume the contracts. *Id.* at 564, 567. The court also concluded that because of the specific requirements in section 365, the sale order of the contracts did not operate as an assumption. *Id.* at 562. The court declined to decide whether the contracts "rode through" the bankruptcy, concluding that because the contracts had not been assumed, the non-debtor parties to them were subject to preference avoidance provisions. *Id.* at 566.

While none of these cases precisely fit the factual situation here, they are instructive for determining what happens in a situation such as this when the purchaser of an asset related to an executory contract has realized the benefits of the asset it purchased, but the related executory contract was not explicitly assumed and assigned by the debtor as required by section 365. In none of the cases did the courts try to manipulate the transactions in order to force the debtor and the

17

executory contract into compliance with section 365. Rather, the courts looked at what actually occurred in the bankruptcy proceedings and what rights and liabilities the parties intended to transfer.

Looking at what the parties intended here, we begin with the APA. In Article I, Noble agreed to purchase assets, including oil and gas leases, as described in Exhibit A. Section 1.04 is entitled "Assumed Liabilities" and provides that "[i]n consideration for the sale of the Assets, Buyer shall be responsible for the liabilities described in this Section." Neither the Exchange Agreement nor the indemnity obligation is included in that section as a liability. Section 1.06—"Liabilities"—provides that "[e]xcept for the Assumed Liabilities and Assumed Obligations (as such term is defined in Section 8.03 below), . . . *Buyer is not assuming any liability of, or related to the Assets of any kind or description whatsoever*." (Emphasis added).

Article III is entitled "Representations and Warranties." It states that Alma represented and warranted to Noble: "Exhibit 'D' sets forth a list of the known contracts, agreements, plans, and commitments to which [Alma is] a party or . . . bound," which meet the following criteria: "[a]ny guaranty, direct or indirect, by any affiliate of [Alma] of any contract, lease or agreement entered into by [Alma]," and "[a]ny agreement of surety, guarantee or indemnification by [Alma] or any of [its] affiliates outside of the ordinary course of business." The exchange Agreement was not listed on Exhibit D.

Article VIII contains obligations after closing. Section 8.03 sets out Noble's post-closing obligations including to assume "all duties and obligations as the owner of the Assets which accrue or arise from and after the Closing Date, including . . . [to] perform obligations under any executory contracts or unexpired oil and gas leases *expressly assumed hereunder*." (emphasis added). Section

18

8.04 sets out Alma's post-closing obligations including "Except for those matters expressly assumed by [Noble] . . . [Alma] shall be responsible for and discharge all claims, costs, expenses and liabilities with respect to the Assets which accrue or relate to the times prior to" the effective date of closing.

Nothing in the APA indicates that Noble expressly assumed the Exchange Agreement or the indemnity obligation in it. Conoco points to the language in the confirmation order specifying that Alma was assuming and assigning to Noble all executory contracts not previously assumed or rejected. But as noted in the cases referenced above, when an executory contract is not assumed and assigned according to the section 365 requirements, as the Exchange Agreement was not, courts have looked to whether the parties intended for the debtor to assume the contract. And here, under the clear language of the APA, Noble intended to limit its assumption of any liabilities to obligations under executory contracts that were "expressly assumed" under the APA. Neither party argues that the Exchange Agreement was expressly assumed under the APA by Noble. To respond to what the Court says about the Plan language not rejecting all agreements not assumed when it could have done so, Noble did not want to assume any liabilities it did not know of—and said so in the APA.

Further, because Alma did not disclose the Exchange Agreement as required by bankruptcy law, as the debtor it bore the risk of nondisclosure. *See In re JZ L.L.C.*, 371 B.R. at 417. The risk of nondisclosure rightly should be that Alma, not the asset purchaser and its successors in interest, would remain liable for the parts of the Exchange Agreement that Alma did not disclose and assign within the framework of the bankruptcy proceeding. *See In re Allegheny Health*, 383 F.3d at 177.

19

Conoco was a party to multiple other executory contracts with Alma that were listed as such in Alma's bankruptcy disclosure statement, along with a note about whether they were to be assumed or rejected and the identities of the parties to the contracts. So, Conoco was in a position to object to Alma's failure to include the Exchange Agreement in its disclosures and request that the bankruptcy court require Alma to either assume and assign the Agreement or reject it. Conoco did not do so. *See id.* (noting that the nondebtor party to an executory contract had itself to blame for not objecting to the asset purchase agreement). Under the circumstances, Conoco would not be deprived of its contractual indemnity right if the Court were to follow applicable bankruptcy precedent and hold that the Exchange Agreement rode through the bankruptcy and remained a liability of reorganized Alma. The right simply would not attach to Noble; it would attach to the reorganized party that succeeded to the interests of the party with whom Conoco made its deal in the beginning—Alma.

I would reverse the judgment of the court of appeals. Because the Court does not, I respectfully dissent.

_____
Phil Johnson
Justice

**OPINION DELIVERED:** June 23, 2017

20